UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| WILLIE JAMES NEWMAN, | ) | |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | |
| MICHAEL VAGNINI, | ) | Case No. 2:15-cv-01363-JPS |
| JEFFREY CLINE, | ) | |
| PAUL MARTINEZ and | ) | Judge J. P. Stadtmueller |
| CITY OF MILWAUKEE, | ) ) | |
| Defendants. | ) | Jury Demand |

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS'**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

Now comes the plaintiff, Willie James Newman ("Newman"), by his attorney, Ronald Bornstein, and responds to Defendants Michael Vagnini ("Vagnini"), Jeffrey Cline ("Cline"), Paul Martinez ("Martinez") and City of Milwaukee ("City")'s Motion for Partial Summary Judgment as follows:

**I.   Introduction**

In this lawsuit, Newman alleges that:

Erstwhile City of Milwaukee Police Officer, Michael Vagnini, conducted an unreasonable search of him on April 30, 2010, at approximately 1:18 a.m., in the parking lot of Haji's Red Hot restaurant. In particular, Mr. Newman alleges that Vagnini pulled down Mr. Newman's pants and underwear to just above his knees; in the process, exposing Mr. Newman's genitalia to police officers and other onlookers in the parking lot; and

1

furthermore, that, after exposing Mr. Newman's genitalia, Vagnini used his bare hands to search under Mr. Newman's scrotum. (Complaint ¶ 13, 18, 19, 34, 35).

Additionally, Mr. Newman alleges that the defendants, Jeffrey Cline and Paul Martinez, took no action to intervene and stop then Officer Vagnini's unconstitutional conduct even though, as police officers, they had a duty, accountability and opportunity to do so. (Complaint ¶ 23).

Additionally, Mr. Newman brings a Monell claim against the City of Milwaukee, alleging that the City, "through its Chief of Police, the defendant, Edward Flynn, and/or other supervisory members of said Department, failed to take those steps necessary to provide adequate supervision and/or training to then Officer Vagnini or other officers similarly situated, or in lieu thereof, failed to take all steps reasonably necessary under the circumstances to protect African American male residents of the City of Milwaukee from the defendant, then Officer Vagnini's improper, illegal and unconstitutional conduct." (Complaint ¶ 40).

The City, and Messrs. Vagnini, Cline and Martinez, concede that Mr. Newman's unreasonable search and failure to intervene claims present questions of fact to be resolved at trial. (Brief p. 2).

Their present motion for partial summary judgment is directed solely to Mr. Newman's Monell failure to train and failure to supervise claims against the City. (Brief p. 2, 3).

II.    **Statement of Facts**

2

## Stop and Search of Newman

Mr. Newman's date of birth is August 1, 1977.  PPFF ¶ 1.

On April 30, 2010, at roughly 1:18 a.m., Mr. Newman was in a car parked in the parking lot at Haji's Red Hot restaurant located at the intersection of 21st Street and Hopkins Avenue.  PPFF ¶ 2.

After waiting approximately 10 to 15 minutes in the parking lot while his food was being prepared, Mr. Newman noticed individuals at the scene start to scatter and disburse. PPFF ¶ 3.

Mr. Newman then saw a squad car that had entered Haji's parking lot off of Hopkins.  PPFF ¶ 4.

Mr. Newman then saw a second squad car enter Haji's parking lot.  PPFF ¶ 5.

At that time, then Officer Vagnini and two other officers went over to where Mr. Newman was seated in the car, stuck guns in his face and forced him to open his car door and exit the vehicle.  PPFF ¶ 6.

At his deposition, Mr. Newman testified as to what happened after he exited the vehicle as follows:

> "Q. Okay.  What I want to do now is pick up from that point.  So can you tell me what happened next, then, after you opened your car door and got out of your car?
> I got out of the vehicle, I was searched by an officer, then Officer Vagnini said the search wasn't good enough.  Therefore, he walked up to me, unbuckled my belt, my pants, pulled my pants down to my knees with my underwear, and he went in my private area, my genitals, with his bare hands, and he searched me, humiliated me.
> I continued to have my hands up in the air, telling this man

3

that this wasn't right, letting this man know that he's violating my rights as a man, as a human, as a citizen, but that wasn't good enough. He – like I said, he went through me, searched me with his bare hands, and after that, I was put into a vehicle." PPFF ¶ 7.

### Background Facts Concerning Milwaukee Police Department District 5 Policies and Procedures

Milwaukee Police Department District 5 is stationed in an area of the city that is approximately 90% African American. PPFF ¶ 8.

Between at least 2010 and 2012, District 5 had a late power shift that utilized an anti-gang unit. PPFF ¶ 9.

During that time frame, there were approximately nine people assigned to this anti-gang unit at District 5; those individuals being Michael Vagnini, Jacob Knight, Zachary Thoms, Paul Martinez, Jeff Dollhopf, Jason Blichweihl, Gregory Kuspa, Jeffrey Cline and Louis Kopesky. PPFF ¶ 10.

Jason Mucha was their supervising sergeant. PPFF ¶ 11.

During this period, no African American officers were assigned to this anti-gang unit. PPFF ¶ 12.

The purpose of this anti-gang unit was proactive policing. PPFF ¶ 13.

In conducting proactive policing, these officers only took assignments that were priority one or two codes, or if everyone else who was assigned to the dispatch cars were not available. Otherwise, this unit was afforded the opportunity to volunteer for certain assignments. PPFF ¶ 14.

On a typical day, this unit would get together; go on the street and patrol in a line

4

of cars referred to as "the train."  PPFF ¶ 15.

Utilizing the train for purposes of proactive policing was a strategy of the department.  PPFF ¶ 16.

This departmental strategy of proactive policing in District 5 by utilizing the "train" concept was disbanded on March 20, 2012 because its officers were all suspended.  PPFF ¶ 17.

In utilizing the "train" strategy of proactive policing, Vagnini was typically in the lead car and would be responsible to pick which vehicles or field interviews would be conducted.  PPFF ¶ 18.

After Chief Flynn took over as police chief, Vagnini and other officers attended meetings with him and would report back to other officers at District 5 concerning what occurred at these meetings.  PPFF ¶ 19.

On these occasions, these officers reported to then Officer Jacob Knight what the priorities in the department were, as reflected by the command staff and the Chief of Police.  PPFF ¶ 20.

Then Officer Knight's understanding of what was being communicated to him by these officers was that the Chief of Police and command staff wanted dots on a map to show that police work was being done; they wanted traffic stops and field interview stops in the area so they could say that something was being done by the police.  PPFF ¶ 21.

Following 2008, after Chief Flynn became chief, after a serious crime would happen in a certain neighborhood, the policing technique that was directed through from

5

the command staff to Knight and his co-officers was to saturate that area, make traffic stops and field interviews. PPFF ¶ 22.

The more stops and field interviews the officers at District 5 would do, the likelihood of conducting a pat down or search of some nature would increase. PPFF ¶ 23.

Chief Flynn did not know that the train strategy of policing was being used in District 5 in the years 2008, 2009, 2010 and 2011. PPFF ¶ 24.

If Chief Flynn had been aware that this "train" policing strategy was being used by District 5 officers in the years 2008, 2009, 2010 or 2011, he would have stopped that form of policing because it is not usually an effective use of resources. PPFF ¶ 25.

In August of 2005, Milwaukee County Circuit Court Judge Charles F. Kahn, Jr. ruled that several persons who had accused then Sergeant Jason Mucha of using excessive force and/or planting drugs could testify in a criminal case where the defendant accused Mucha of similar conduct. PPFF ¶ 26.

On March 14, 2006, the Wisconsin Court of Appeals issued an opinion reversing the trial court decision that denied a criminal defendant's request to introduce evidence that Mucha had used excessive force and/or planted drugs on other persons. PPFF ¶ 27.

The Captain of District 5, Edith Hudson, frequently took Vagnini to meetings conducted by Chief Flynn, with Chief Flynn believing Vagnini to be an effective, productive, successful officer. PPFF ¶ 28.

In March of 2012, when the strip search scandal first came to public light, Chief

6

Flynn stated that the issue of conducting strip searches and body cavity searches was a "serious training issue." PPFF ¶ 29.

Sergeant Mucha, as then supervisor of Vagnini, received no training on when, or under what circumstances, he could conduct strip or body cavity searches. PPFF ¶ 30.

Then Officer Knight believed, while working on the Power Shift Unit at District 5 with Vagnini, that it was proper for an officer to put his hands in a person's pants, including down to his butt crack and testicles, during a search if he felt an object he believed to be drugs. PPFF ¶ 31.

Then Office Knight was not taught, either at the police academy or on the job, when, if ever, he could do a body cavity search. PPFF ¶ 32.

District 5 officers received no training in pat downs while Edith Hudson was captain of that district. PPFF ¶ 33.

On October 8, 2012, the State of Wisconsin criminally charged Vagnini, Knight and Officers Jeffrey Dollhopf and Brian Kozelek with various felonies and/or misdemeanors related to illegal body cavity and strip searches of African American citizens. PPFF ¶ 34.

Vagnini was charged with nine felony counts of misconduct in public office, four felony counts of second degree sexual assault, one felony count of third degree sexual assault, two misdemeanor counts of fourth degree sexual assault, one misdemeanor count of illegal body cavity search and six counts of misdemeanor illegal strip searches. PPFF ¶ 35.

Knight was charged with one felony count of misconduct in public office and one misdemeanor count of illegal body cavity search. PPFF ¶ 36.

On April 22, 2013, Vagnini pled no contest to four felony charges of misconduct in public office and four misdemeanor charges of conducting illegal strip and body cavity searches. PPFF ¶ 37.

At his sentencing, Vagnini apologized for his actions; said he did not mean to hurt anyone; was sorry that he misinterpreted the law and admitted culpability for the offenses. PPFF ¶ 38.

On June 21, 2013, Vagnini was sentenced to 26 months in prison and 34 months of extended supervision. PPFF ¶ 39.

On October 4, 2013, Knight was sentenced to 20 days in the House of Correction, ordered to pay a $300 fine and complete 60 hours of community service. PPFF ¶ 40.

In 2013, following the John Doe investigation into the conduct of Vagnini and others, Chief Flynn instituted department wide retraining of policies for searches. PPFF ¶ 41.

Edith Hudson, who was the captain of District 5 from 2008 to 2011, did not know how Sergeant Mucha's unit operated; she never went out with them on the street; she did not know he handled pat down searches; and she made no effort to find out. PPFF ¶ 42.

Captain Hudson was unfamiliar with this type of proactive policing strategy and other than on one occasion, when executing a search warrant, never went out on the street with these officers to observe their conduct. PPFF ¶ 43.

At his deposition, with respect to supervision of searching techniques at District 5, Knight testified as follows:

> "Q. Did he ever discuss with you or anyone else in your unit the proper way to do pat downs and searches?
> A. No.
> Q. Did the lieutenant ever do that?
> A. No.
> Q. You kind of chuck- -- why did you chuckle?
> A. No. Our lieutenants didn't tell us anything.
> Q. Brunson was not involved?
> A. No.
> Q. And Hudson was not involved?
> A. No.
> Q. Captains? So they never told you anything in terms of your procedures or practices with regard to stops and searches or pat downs or anything like that, right?
> A. Like I said before, they just wanted dots.
> Q. They just wanted dots. So they were fine with whatever you did out there. They didn't ask questions, right?
> Q. Is that fair to say?
> A. That's fair to say." PPFF ¶ 44.

With respect to departmental training regarding how to properly perform searches, Knight testified as follows:

> "Q. Do you feel that you were framed, to some degree, by the Milwaukee Police Department?
> A. Yes. . . .
>
> Q. All right. Would you say that the police department did not properly train you in the areas of searches, that you ultimately got convicted for?
> MR. REAK: Object to form.
> THE WITNESS: I would say they didn't properly train us on strip searches and body cavity searches, yes.
> Q. All right. And is it true that if they had properly trained you in those areas, you wouldn't be – you'd still be on the police department today?

9

> A. Yes.
> Q. And Vagnini would not be in jail?
> A. Possibly, yes." PPFF ¶ 45.

Chief Flynn approved the multiple promotions of District 5 Supervisors Brunson and Hudson, despite the fact that he acknowledged that they presided over a unit at District 5 that committed an "egregious violation of the public trust;" "went rogue;" "broke the law" and violated Milwaukee Police Department policy. PPFF ¶ 46.

Numerous lawsuits were filed, and settled, in this district by African Americans alleging that Vagnini and other officers in District 5 subjected them to unconstitutional strip and body cavity searches. PPFF ¶ 47.

With respect to Milwaukee Police Department training concerning how to retrieve suspected drugs from a suspect as part of a search, Mr. Vagnini testified as follows:

> "Q. The technique that you told me about that you used on this occasion with Mr. Newman where you pulled over the front of his pants and then retrieved the baggies, was that part of a technique that you were taught?
> A. No. The Milwaukee Police Department doesn't train anything on how to recover drugs. That was never trained to anyone. There was no training on how you – this is how you search someone, and this is how you use a bladed hand between their butt cheeks and between their thighs and blah, blah, blah. And then that's where the training stopped. Well, that's great. How are you supposed to get that cocaine out now?
>      So that was never discussed. The way I actually learned was other officers talking about it, and then one of the very first cases I ever had with someone having cocaine hidden, it was 2007 I want to say, and Grant Huebner and Dave Stegall – Grant Huebner, ADA, and the Dave Stegall, who doesn't work there anymore I understand, we discussed that case because it went to a motion hearing on it.

So that's basically where I learned was from them. This is what you can do. You can manipulate it as long as you don't expose anything private. Went through all that. That was probably where I learned the majority of what I learned about things that I could or could not do on the street was not from MPD, it was at the DA's office, because I would sit there and play what–if games all day; if this happens, what about this. And I would learn from them.

As far as MPD's training, they trained you how to search people, they trained you how to do a pat-down, but there was no this is how you recover drugs, suspected narcotics that are hidden here, here or here.

And basically the DA's office, when I talked with those guys about it and other DAs, was as long as you don't expose anything private, and you don't have skin-to-skin contact, you're good, in the shortest of terms.

Q. Because if you had skin-to-skin contact with a suspect's genitalia, you exposed their genitalia, that could constitute an illegal strip search?

A. Correct. If a person's privates are exposed or you have skin-to-skin contact intentionally, you know, that's – because there's different things.

Q. The techniques that you used to recover drugs that you became aware of as a result of a pat-down, did you demonstrate those techniques to any of your supervisors in the police department?

A. I don't know that I specifically demonstrated. I would guess that Mucha saw me do it more than once. I mean, he was always around, and we do it all the time.

Q. That's Sergeant Jason Mucha?

A. Correct, sir. And you know, again Jason was probably the biggest proponent of, don't ask anyone here, ask the DA's office. If the DA's office says you can do it, then you can do it. So using – You know, manipulating it with people's clothing, it all basically came down to that last thing. As long as you don't expose anything private, and as long as you're not touching them skin to skin on a private area intentionally, you're basically good.

So that was always my understanding of the law, and to this day it's still my understanding of the law." PPFF ¶ 48.

### III. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no

11

genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby Inc., 477 U.S. 242, 247-248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

"Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." Anderson, 477 U.S. at 248.

"A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

"However, in deciding whether there are any genuine issues of material fact, the Court must view the record in a light most favorable to the non-movant and draw all reasonable inferences in their favor." Id at 255.

"The Court cannot weigh the evidence or decide which party's submissions and testimony are more believable." Id.

## IV. Argument

**The City is Not Entitled to Summary Judgment as to Mr. Newman's <u>Monell</u> Claim**

To hold a municipality liable under § 1983, it must be shown that the constitutional violation resulted from a municipal policy or practice. Monell v. Department of Social Services, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611, 638 (1978).

Municipal liability under Monell requires a showing that there is proof of "a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force

12

Case 2:15-cv-01363-JPS   Filed 09/12/16   Page 12 of 18   Document 27

genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby Inc., 477 U.S. 242, 247-248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

"Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." Anderson, 477 U.S. at 248.

"A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

"However, in deciding whether there are any genuine issues of material fact, the Court must view the record in a light most favorable to the non-movant and draw all reasonable inferences in their favor." Id at 255.

"The Court cannot weigh the evidence or decide which party's submissions and testimony are more believable." Id.

## IV. Argument

**The City is Not Entitled to Summary Judgment as to Mr. Newman's <u>Monell</u> Claim**

To hold a municipality liable under § 1983, it must be shown that the constitutional violation resulted from a municipal policy or practice. Monell v. Department of Social Services, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611, 638 (1978).

Municipal liability under Monell requires a showing that there is proof of "a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force

12

Case 2:15-cv-01363-JPS   Filed 09/12/16   Page 12 of 18   Document 27

of law." City of St. Louis v. Praprotnik, 485 U.S. 112, 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988).

To demonstrate that a municipality is liable for a harmful custom or practice, the plaintiff must show that municipal policy makers were deliberately indifferent as to the known and/or obvious consequences of the unconstitutional conduct. City of Canton v. Harris, 489 U.S. 378, 388-389 N.10 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

Causation is established where the municipal policy in question is a "moving force" behind the constitutional injury inflicted in a particular case. Monell, 436 U.S. at 694.

A municipality's failure to train and/or failure to supervise its police officers may give rise to municipal liability if the alleged failure to train and/or failure to supervise amounts to "deliberate indifference to the rights of persons with whom the [untrained employee] come into contact. Canton, 49 U.S. at 388.

"It may happen that in light of the duties assigned to specific officers or employees, the need for more, different training is so obvious and inadequacies so likely to result in the violation of constitutional rights, that the policy makers of the city can reasonably be said to have been deliberately indifferent to the need." Canton at p. 389.

Proof of a municipality's deliberate indifference can take the form of either the failure to provide adequate training in light of foreseeable consequences; or the failure to act in response to repeated complaints of constitutional violations by its officers. Canton at p. 378, 388.

13

A municipality shows deliberate indifference when it fails to train its employees to handle a recurring situation that presents an obvious potential for a constitutional violation and this failure to train results in a constitutional violation.  Dunn v. City of Elgin, 347 F.3d 641, 646 citing Board of County Commissioners of Bryan County v. Brown, 520 U.S. 397, 409, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997); Robles v. City of Fort Wayne, 113 F.3d 732, 735 (7th Cir. 1997).

Additionally, a municipality also shows deliberate indifference when it fails to provide further training after learning of a pattern of constitutional violations by the police.  Dunn v. City Elgin, supra p. 646.

The evidence submitted to date supports a number of de facto practices and customs by the City of Milwaukee Police Department involving performing illegal strip searches; a failure to adequately train, discipline, supervise and monitor its police officers at District 5; and then, upon discovery of the unconstitutional conduct and the criminal conviction of its offending officers, the actual ratification of that conduct by Chief Flynn's promoting the two supervisory officers, Lieutenant Brunson and Captain Hudson. PPFF ¶ 46.

Following 2008, after Chief Flynn became Chief, after a serious crime would happen in a certain neighborhood, the policing technique that was directed through from the command staff to police officers such as Vagnini and other members of the anti-gang unit at District 5, was to put in place a policy of "proactive policing" which emphasized field interviews; traffic stops; which in turn generated pat-down and other searches of the

14

African American males located within District 5 of the City. PPFF ¶ 22.

Against this backdrop of the Chief's proactive policy was the questionable training of these subordinate police officers in performing proper, legally permissible strip searches.

One member of this power shift unit at District 5, Jacob Knight, believed that it was proper for an officer to put his hands in a person's pants, including down to his butt crack and testicles, during a search if he felt an object he believed to be drugs. PPFF ¶ 31.

Furthermore, per Knight, his supervisors at District 5 never discussed with him or anyone else in this unit, the proper way to conduct pat downs and searches. PPFF ¶ 44, 45.

Vagnini testified that the Milwaukee Police Department did not provide him with any training on how to recover suspected drugs as part of a pat down search and that, in performing a pat down search, as long as he did not expose the suspects genitalia or "intentionally" have bare skin to skin contact with their private parts, he was "basically good." PPFF ¶ 48.

This policy of proactive policing, combined with questionable training on how to properly perform permissible strip searches, was then combined with a lack of supervision of these subordinate officers conducting these allegedly unconstitutional strip searches. PPFF ¶ 42, 44.

Of additional importance is the fact that after Vagnini's unconstitutional conduct

at District 5 became known to Chief Flynn, he, by inference, ratified this conduct by promoting Vagnini's then supervising officers. PPFF ¶ 46.

Consequently, given these facts, while it may be true that police officers assigned to the anti-gang unit at District 5 during this relevant time period may have received instruction regarding the performance of searches, they never received any training on how to recover suspected drugs whose presence may have been felt during the search.

Vagnini believed that in conducting a search, as long as he did not expose the suspect's private parts to public view or "intentionally" have bare skin to skin contact, he was not performing an improper strip search. Vagnini thus believed that if he unintentionally or accidentally had bare skin to skin contact with an individual's private parts, he was acting appropriately.

Likewise, his fellow officer, Jacob Knight, believed that an officer was allowed to put his hands in a person's pants, including down to his butt crack and testicles, during a search if he felt an object he believed to be drugs.

In sum, starting in 2008, Chief Flynn instituted a policy of proactive policing in District 5 that would, of necessity, result in police pat downs and searches of individuals in that district. This policy created a recurring situation that presented an obvious potential for constitutional violations if these subordinate police officers did not receive training in how to recover suspected narcotics detected as part of the search and without a policy of supervision in place to determine if these searches were done in a permissible manner.

The evidence adduced to date creates a question of fact as to whether Chief Flynn's policy was done without training these subordinate field officers in how to properly perform strip searches, and without providing supervision to insure that the recurring pat downs and searches were performed in a constitutionally permissible manner. The end result of this conduct is the numerous complaints by African American males alleging that they were the victims of unconstitutional strip searches by District 5 officers.

## CONCLUSION

For the foregoing reasons, questions of fact exist as to Mr. Newman's Monell claims. Therefore, Mr. Newman asks that the defendants' motion for partial summary judgment be denied.

Dated: September 12, 2016

Respectfully submitted,

s/Ronald Bornstein
Counsel for Plaintiff

BORNSTEIN LAW OFFICES, S.C.
735 North Water Street - Suite 516
Milwaukee  WI  53202-4104
(414) 271-1600

## **CERTIFICATE OF SERVICE**

      I, Ronald Bornstein, an attorney, certify that on September 12, 2016, I filed a copy of Plaintiff's Brief in Opposition to Defendants' Motion for Partial Summary Judgment with the Court's CM/ECF electronic filing system and thereby caused a copy of the same to be served on all counsel of record.

                                            s/Ronald Bornstein
                                            Counsel for Plaintiff