UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

| WILLIE JAMES NEWMAN, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| vs. | ) | |
| MICHAEL VAGNINI, | ) | Case No. 2:15-cv-01363-JPS |
| JEFFREY CLINE, | ) | |
| PAUL MARTINEZ and | ) | Judge J. P. Stadtmueller |
| CITY OF MILWAUKEE, | ) | |
| Defendants. | ) | Jury Demand |

**PLAINTIFF'S RESPONSE TO
DEFENDANTS' PROPOSED FINDINGS OF FACT**

Now comes the plaintiff, Willie James Newman ("Newman"), by his attorney, Ronald Bornstein, and submits the following response to Defendants' Proposed Findings of Fact:

**I.     Jurisdiction and Venue**

1.     This Court has jurisdiction over this action, pursuant to 28 U.S.C. §§ 1331 and 1343. (Complaint).

**RESPONSE: Admit.**

2.     The Eastern District of Wisconsin is the proper federal venue for this action, because the claims arise within the geographical boundaries of the Eastern District, within the meaning of 28 U.S.C. § 1391(b). (Complaint).

**RESPONSE: Admit.**

## II. The Parties

3. Mr. Newman claims that certain of his constitutional rights were violated by Milwaukee police personnel on April 30, 2010. (Complaint).

**RESPONSE: Admit.**

4. Officers Vagnini, Cline, and Martinez, at all times relevant to the subject matter of this litigation, were employed as police officers with the Milwaukee Police Department. (Complaint; Answer).

**RESPONSE: Admit.**

5. The City of Milwaukee is a municipal corporation, which employed the defendant officers on April 30, 2010. (Complaint; Answer).

**RESPONSE: Admit.**

## III. The MPD Investigation

6. David A. Salazar, Jr. is currently employed as a captain with the Milwaukee Police Department. (Salazar Aff. ¶ 2).

**RESPONSE: Admit.**

7. In early 2012, Captain Salazar was assigned as a lieutenant to the Internal Affairs Division of the Milwaukee Police Department. (Salazar Aff. ¶ 2).

**RESPONSE: Admit.**

8. In the context of that assignment, Captain Salazar had supervisory responsibilities over MPD personnel who investigated complaints against police officers which suggested criminal activity. (Salazar Aff. ¶ 3).

2

**RESPONSE: Admit.**

9. On approximately January 31, 2012, two citizen complaints were brought to the attention of Captain Salazar by representatives of the Milwaukee Fire and Police Commission. (Salazar Aff. ¶ 4).

**RESPONSE: Admit.**

10. The two complainants were R. M. and B. C. (Salazar Aff. ¶ 4).

**RESPONSE: Admit.**

11. These two citizens apparently had presented themselves together at the offices of the Milwaukee Fire and Police Commission on January 31, 2012, and each filed a separate complaint against Officer Michael Vagnini, alleging that he had engaged in unlawful search practices during the course of a traffic stop. (Salazar Aff. ¶ 4).

**RESPONSE: Admit.**

12. As a standard procedure, upon receipt of those two complaints, which were similar in nature, representatives of the Internal Affairs Division reviewed Office Vagnini's internal affairs records. (Salazar Aff. ¶ 5).

**RESPONSE: Admit.**

13. That review indicated that in 2010, a similar allegation had been raised against Officer Vagnini by L.R., who filed his complaint on March 5, 2010 regarding a search that took place on February 27, 2010. (Salazar Aff. ¶ 6; Lappen Aff. ¶ 6).

**RESPONSE: Admit.**

14. That matter had been investigated, and the lieutenant who was then a

3

supervisor for the Internal Affairs Division determined that the allgations raised were "unsubstantiated," and the file was closed on April 5, 2010. (Salazar Aff. ¶ 6; Lappen Aff. ¶ 6).

**RESPONSE: Admit.**

15. The review of Officer Vagnini's records also revealed a similar complaint filed against him in 2011 by M. T. (Salazar Aff. ¶ 7).

**RESPONSE: Admit.**

16. That allegation was investigated, and ultimately, it was referred to the Office of the Milwaukee County District Attorney for prosecutorial review. (Salazar Aff. ¶ 7).

**RESPONSE: Admit.**

17. The District Attorney's Office declined to prosecute any criminal charges against Officer Vagnini, relative to the allegations raised by M. T. (Salazar Aff. ¶ 7).

**RESPONSE: Admit.**

18. M. T. died at some time after the matter had been referred to the Office of the Milwaukee County District Attorney. (Salazar Aff. ¶ 8).

**RESPONSE: Admit.**

19. In any event, no further review or response was provided by the Milwaukee Police Department, relative to complainant M. T. (Salazar Aff. ¶ 8).

**RESPONSE: Admit.**

20. After looking at the complaints raised by L. R. and M. T., in conjunction with the then-current complaints raised by R. M. and B. C., Captain Salazar determined that the four complaints taken together might constitute a pattern of inappropriate and/or unlawful behavior on the part of Officer Vagnini. (Salazar Aff. ¶ 9).

**RESPONSE: Admit.**

21. Therefore, Captain Salazar reopened the L. R. and M. T. files, and directed his staff to conduct further investigation regarding those complaints. (Salazar Aff. ¶ 9).

**RESPONSE: Admit.**

22. Captain Salazar also ordered that investigatory files be opened relative to the complaint of R. M. and B. C. (Salazar Aff. ¶ 9).

**RESPONSE: Admit.**

23. By March 20, 2012, Mr. Newman had not filed any complaint against any officer, regarding his April 30, 2010 stop, search, and arrest. (Salazar Aff. ¶ 9).

**RESPONSE: Admit.**

24. Prior to March, 2012, no complaints had been raised against either Officer Cline or Officer Martinez regarding allegations that either of them performed any unlawful searches of citizens. (Salazar Aff. ¶¶ 10 - 11).

**RESPONSE: Admit.**

25. By February 13, 2012, Captain Salazar had contacted representatives of the Office of the Milwaukee County District Attorney, to receive their guidance

5

regarding how to proceed with the investigations of the complaint of L. R., M. T., R. M., and B. C., which by then he believed to be of a criminal nature. (Salazar Aff. ¶ 12).

**RESPONSE: Admit.**

26. Throughout the course of these events, Captain Salazar kept his captain, who was Diana Rowe, along with then Assistant Chief John Hagen, apprised of not only the complaints, but also the investigatory work of his unit relative to those complaints. (Salazar Aff. ¶ 14).

**RESPONSE: Admit.**

27. Chief Flynn was first fully briefed regarding the four complaints and the IAD investigation regarding them, on March 19 or 20, 2012. (Salazar Aff. ¶ 14).

**RESPONSE: Admit.**

28. Immediately thereafter, and at the direction of Chief Flynn, Officer Vagnini, along with other officers assigned to his shift and unit at his district station, were suspended. (Salazar Aff. ¶ 15).

**RESPONSE: Admit.**

29. In short, those officers' police powers were suspended, and they were reassigned to various work locations throughout the Milwaukee Police Department, pending the completion of the IAD investigations. (Salazar Aff. ¶ 15).

**RESPONSE: Admit.**

30. Captain Salazar observed that by March 21, 2012, there had been much news media reporting relative to the allegations of unlawful strip and body cavity

searches made against MPD officers. (Salazar Aff. ¶ 16).

**RESPONSE: Admit.**

31. In fact, the Milwaukee Police Department issued a press release and Chief Flynn held a press conference regarding same on March 21, 2012. (Salazar Aff. ¶ 16).

**RESPONSE: Admit.**

32. Prior to March of 2012, Chief Flynn was not aware of 1.) any incidents involving individuals who claimed to have been subjected to improper body cavity searches, strip searches, or pat-down searches by Milwaukee police officers, 2.) any incident wherein Milwaukee police officers evidenced that they did not understand either Milwaukee Police Department policies or Wisconsin law, related to searches of individuals, or 3.) that additional training was needed by officers regarding search-related issues. (Flynn Aff. ¶¶ 14 – 15).

**RESPONSE: Admit that Chief Flynn was not aware of 1.) any incidents involving individuals who claimed to have been subjected to improper body cavity searches, strip searches, or pat-down searches by Milwaukee police officers, 2.) any incident wherein Milwaukee police officers evidenced that they did not understand either Milwaukee Police Department policies or Wisconsin law, related to searches of individuals, or 3.) that additional training was needed by officers regarding search-related issues, however, deny any implication that Chief Flynn should not have been aware of 1.) any incidents involving individuals who claimed to have been**

**subjected to improper body cavity searches, strip searches, or pat-down searches by Milwaukee police officers, 2.) any incident wherein Milwaukee police officers evidenced that they did not understand either Milwaukee Police Department policies or Wisconsin law, related to searches of individuals, or 3.) that additional training was needed by officers regarding search-related issues. (PPFF ¶ 29, 30, 31, 32, 38, 41, 44, 45, 48).**

33. Prior to March of 2012, Chief Flynn was not aware of any conduct of any officer which suggested that citizens were being searched in an unlawful manner, that officers needed additional training as to how to conduct a proper search, or that officers were not being properly supervised regarding their search-related tactics. (Flynn Aff. ¶¶ 16 – 17).

**RESPONSE: Admit that Chief Flynn was not aware of any conduct of any officer which suggested that citizens were being searched in an unlawful manner, that officers needed additional training as to how to conduct a proper search, or that officers were not being properly supervised regarding their search-related tactics, however, deny any implication that Chief Flynn should not have been aware of any conduct of any officer which suggested that citizens were being searched in an unlawful manner, that officers needed additional training as to how to conduct a proper search, or that officers were not being properly supervised regarding their search-related tactics. (Id.).**

IV. <u>**MPD Policies and Training**</u>

8

34. The MPD trains its officers using the Wisconsin Law Enforcement Officers Criminal Law Handbook ("Handbook"), which is published by the Wisconsin Department of Justice, to present officers with its policies regarding conducting searches of subjects, including frisk searches and strip searches. (Salazar Aff. ¶ 17. Note that excerpts from the Handbook are attached to the Salazar affidavit as Exhibit DS-B, pages DS6-DS17).

**RESPONSE: Admit.**

35. The Handbook provides that a stopped person may be subjected to a frisk search if an officer reasonably suspects "that he/she or another is in danger of physical injury from that person." (Handbook p. 61, attached to Salazar Affidavit as Exh. DS-B, App. p. DS16).

**RESPONSE: Admit.**

36. The Handbook provides that a strip search may be conducted if the circumstances then present for the officer meet the requirements of Wis. Stat. Sec. 968.225. (Id. at p. 57, App. p. DS12).

**RESPONSE: Admit.**

37. The following in the MPD Standard Operating Procedure regarding "strip searches," which was in effect in April, 2010:

    **90.05    <u>SEARCHING OF PRISONERS</u>**

        C.    STRIP SEARCH

        1.    Strip searches shall be conducted in accordance with Wisconsin

9

> Statute 968.255 (Strip searches) and 968.256 (Search of physically disabled person) and only with the approval of a captain or higher authority. Further, any strip search or body cavity search shall **not** take place in the absence of probable cause to believe a person in custody has secreted a weapon or evidence.
>
> **Note: Strip searches shall <u>NOT</u> be conducted in the booking room due to the presence of video equipment.**
>
> 2. **Strip search** means a search in which a detained person's genitals, pubic area, buttock or anus, or a detained female person's breast, is uncovered and either exposed to view or touched by a person conducting the search. (Salazar Aff. Exh. DS-A p. 3).

**RESPONSE: Admit.**

38. Officers Vagnini, Cline and Martinez were trained that an officer could conduct a frisk or a pat-down search if he reasonably suspected that a subject posed a danger of physical injury to the officer or another person. (Vagnini Aff. ¶ 10; Cline Aff. ¶ 8; Martinez Aff. ¶ 10).

**RESPONSE: Admit.**

39. The defendant officers understood the primary purpose of a frisk or pat-down search is to determine if the subject being patted down/frisked is concealing a weapon. (Vagnini Aff. ¶ 11; Cline Aff. ¶ 9; Martinez Aff. ¶ 11).

**RESPONSE: Admit.**

40. The defendant officers understood that an officer could conduct a strip search of an arrested subject, but only pursuant to the parameters established by Wisconsin Statute Section 968.255, and that Milwaukee Police Department Standard Operating Procedure 090 mirrored that statute section, with regard to the proper

10

parameters for conducting a strip search. (Vagnini Aff. ¶ 12; Cline Aff. ¶ 10; Martinez Aff. ¶ 12).

**RESPONSE: Deny. (PPFF ¶ 48).**

41. The defendant officers understood that as police officers, they could not, under any circumstances, conduct a body cavity search. (Vagnini Aff. ¶ 12; Cline Aff. ¶ 10; Martinez Aff. ¶ 12).

**RESPONSE: Admit.**

42. The defendant officers were fully aware that a "strip search" meant a search during which a detained person's genitals, pubic area, buttocks, or anus or a detained female person's breasts, is uncovered and either is exposed to view or is touched by a person conducting such a search. (Vagnini Aff. ¶ 13; Cline Aff. ¶ 11; Martinez Aff. ¶ 13).

**RESPONSE: Deny. (PPFF ¶ 48).**

43. The defendant officers were fully aware that it was unlawful for them to pull down a subject's pants and underwear and expose his buttocks and/or genitalia while conducting any type of search in a place subject to public view. (Vagnini Aff. ¶ 13; Cline Aff. ¶ 11; Martinez Aff. ¶ 13).

**RESPONSE: Admit.**

44. The defendant officers also understood that it was unlawful for them to have skin-to-skin contact with the buttocks and/or genitalia of a person being searched, and that they could not touch a man's scrotum to assist in the process of retrieving

illegal narcotics which he secreted under or near his scrotum. (Vagnini Aff. ¶ 13; Cline Aff. ¶ 11; Martinez Aff. ¶ 13).

**RESPONSE: Deny. (PPFF ¶ 48).**

45. The defendant officers knew that the Chief of Police did not tolerate officers who violated either departmental rules and/or the law, and that if they conducted any search that was contrary to MPD SOPs and/or state statutes, they could be subject to employment-related discipline, including termination, as well as criminal prosecution, which could result in incarceration. (Vagnini Aff. ¶ 16; Cline Aff. ¶ 15; Martinez Aff. ¶ 14).

**RESPONSE: Admit.**

Dated: September 12, 2016

        Respectfully submitted,

        s/Ronald Bornstein
        Counsel for Plaintiff

BORNSTEIN LAW OFFICES, S.C.
735 North Water Street - Suite 516
Milwaukee WI 53202-4104
(414) 271-1600

## CERTIFICATE OF SERVICE

I, Ronald Bornstein, an attorney, certify that on September 12, 2016, I filed a copy of Plaintiff's Response to Defendants' Proposed Findings of Fact with the Court's CM/ECF electronic filing system and thereby caused a copy of the same to be served on all counsel of record.

        s/Ronald Bornstein
        Counsel for Plaintiff