UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| WILLIE JAMES NEWMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| MICHAEL VAGNINI, | ) | Case No. 2:15-cv-01363-JPS |
| JEFFREY CLINE, | ) | |
| PAUL MARTINEZ and | ) | Judge J. P. Stadtmueller |
| CITY OF MILWAUKEE, | ) | |
| | ) | |
| Defendants. | ) | Jury Demand |

**PLAINTIFF'S CIVIL L.R. 56(b)(2)(B)(ii) PROPOSED FINDINGS OF FACT**

Now comes the plaintiff, Willie James Newman ("Newman"), by his attorney, Ronald Bornstein, and submits the following Proposed Findings of Fact pursuant to Fed. R. Civ. P 56 and Civil L.R. 56(b)(2)(B)(ii):

1. Mr. Newman's date of birth is August 1, 1977. (Bornstein Affidavit, Exhibit 1, Newman Deposition, p. 9).

2. On April 30, 2010, at roughly 1:18 a.m., Mr. Newman was in a car parked in the parking lot at Haji's Red Hot restaurant located at the intersection of 21st Street and Hopkins Avenue. (Bornstein Affidavit, Exhibit 1, Newman Deposition, p. 149, 150, 151, 157).

3. After waiting approximately 10 to 15 minutes in the parking lot while his food was being prepared, Mr. Newman noticed individuals at the scene start to scatter and disburse. (Bornstein Affidavit, Exhibit 1, Newman Deposition, p. 161, 162).

1

4. Mr. Newman then saw a squad car that had entered Haji's parking lot off of Hopkins. (Bornstein Affidavit, Exhibit 1, Newman Deposition, p. 164).

5. Mr. Newman then saw a second squad car enter Haji's parking lot. (Bornstein Affidavit, Exhibit 1, Newman Deposition, p. 167, 168).

6. At that time, then Officer Vagnini and two other officers went over to where Mr. Newman was seated in the car, stuck guns in his face and forced him to open his car door and exit the vehicle. (Bornstein Affidavit, Exhibit 1, Newman Deposition, p. 177).

7. At his deposition, Mr. Newman testified as to what happened after he exited the vehicle as follows:

> "Q. Okay. What I want to do now is pick up from that point. So can you tell me what happened next, then, after you opened your car door and got out of your car?
> A. I got out of the vehicle, I was searched by an officer, then Officer Vagnini said the search wasn't good enough. Therefore, he walked up to me, unbuckled my belt, my pants, pulled my pants down to my knees with my underwear, and he went in my private area, my genitals, with his bare hands, and he searched me, humiliated me.
> I continued to have my hands up in the air, telling this man that this wasn't right, letting this man know that he's violating my rights as a man, as a human, as a citizen, but that wasn't good enough. He – like I said, he went through me, searched me with his bare hands, and after that, I was put into a vehicle." (Bornstein Affidavit, Exhibit 1, Newman Deposition, p. 223).

8. Milwaukee Police Department District 5 is stationed in an area of the city that is approximately 90% African American. (Bornstein Affidavit, Exhibit 2, Vagnini Deposition, Venable v. City of Milwaukee, Case No. 13-CV-1114, p. 243).

9. Between at least 2010 and 2012, District 5 had a late power shift that

2

utilized an anti-gang unit. (Bornstein Affidavit, Exhibit 3, Kuspa Deposition, Venable v. City of Milwaukee, Case No. 13-CV-1114, p. 24-28).

10. During that time frame, there were approximately nine people assigned to this anti-gang unit at District 5; those individuals being Michael Vagnini, Jacob Knight, Zachary Thoms, Paul Martinez, Jeff Dollhopf, Jason Blichweihl, Gregory Kuspa, Jeffrey Cline and Louis Kopesky. (Bornstein Affidavit, Exhibit 3, Kuspa Deposition, Venable v. City of Milwaukee, Case No. 13-CV-1114, p. 28).

11. Jason Mucha was their supervising sergeant. (Bornstein Affidavit, Exhibit 3, Kuspa Deposition, Venable v. City of Milwaukee, Case No. 13-CV-1114, p. 28).

12. During this period, no African American officers were assigned to this anti-gang unit. (Bornstein Affidavit, Exhibit 3, Kuspa Deposition, Venable v. City of Milwaukee, Case No. 13-CV-1114, p. 29).

13. The purpose of this anti-gang unit was proactive policing. (Bornstein Affidavit, Exhibit 3, Kuspa Deposition, Venable v. City of Milwaukee, Case No. 13-CV-1114, p. 29).

14. In conducting proactive policing, these officers only took assignments that were priority one or two codes, or if everyone else who was assigned to the dispatch cars were not available. Otherwise, this unit was afforded the opportunity to volunteer for certain assignments. (Bornstein Affidavit, Exhibit 3, Kuspa Deposition, Venable v. City of Milwaukee, Case No. 13-CV-1114, p. 30).

15. On a typical day, this unit would get together; go on the street and patrol in a line of cars referred to as "the train." (Bornstein Affidavit, Exhibit 3, Kuspa Deposition, Venable v. City of Milwaukee, Case No. 13-CV-1114, p. 31).

16. Utilizing the train for purposes of proactive policing was a strategy of the department. (Bornstein Affidavit, Exhibit 3, Kuspa Deposition, Venable v. City of Milwaukee, Case No. 13-CV-1114, p. 32).

17. This departmental strategy of proactive policing in District 5 by utilizing the "train" concept was disbanded on March 20, 2012 because its officers were all suspended. (Bornstein Affidavit, Exhibit 3, Kuspa Deposition, Venable v. City of Milwaukee, Case No. 13-CV-1114, p. 38).

18. In utilizing the "train" strategy of proactive policing, Vagnini was typically in the lead car and would be responsible to pick which vehicles or field interviews would be conducted. (Bornstein Affidavit, Exhibit 3, Kuspa Deposition, Venable v. City of Milwaukee, Case No. 13-CV-1114, p. 35).

19. After Chief Flynn took over as police chief, Vagnini and other officers attended meetings with him and would report back to other officers at District 5 concerning what occurred at these meetings. (Bornstein Affidavit, Exhibit 4, Knight Deposition, Bohannon v. City of Milwaukee, Case No. 13-CV-1224, p. 42-43).

20. On these occasions, these officers reported to then Officer Jacob Knight what the priorities in the department were, as reflected by the command staff and the Chief of Police. (Bornstein Affidavit, Exhibit 4, Knight Deposition, Bohannon v. City

4

of Milwaukee, Case No. 13-CV-1224, p. 43).

21. Then Officer Knight's understanding of what was being communicated to him by these officers was that the Chief of Police and command staff wanted dots on a map to show that police work was being done; they wanted traffic stops and field interview stops in the area so they could say that something was being done by the police. (Bornstein Affidavit, Exhibit 4, Knight Deposition, Bohannon v. City of Milwaukee, Case No. 13-CV-1224, p. 43-45).

22. Following 2008, after Chief Flynn became chief, after a serious crime would happen in a certain neighborhood, the policing technique that was directed through from the command staff to Knight and his co-officers was to saturate that area, make traffic stops and field interviews. (Bornstein Affidavit, Exhibit 4, Knight Deposition, Bohannon v. City of Milwaukee, Case No. 13-CV-1224, p. 45).

23. The more stops and field interviews the officers at District 5 would do, the likelihood of conducting a pat down or search of some nature would increase. (Bornstein Affidavit, Exhibit 4, Knight Deposition, Bohannon v. City of Milwaukee, Case No. 13-CV-1224, p. 45-46).

24. Chief Flynn did not know that the train strategy of policing was being used in District 5 in the years 2008, 2009, 2010 and 2011. (Bornstein Affidavit, Exhibit 5, Flynn Deposition, Angus Wright v. City of Milwaukee, Case No. 13-CV-1028, p. 60-62).

25. If Chief Flynn had been aware that this "train" policing strategy was

5

being used by District 5 officers in the years 2008, 2009, 2010 or 2011, he would have stopped that form of policing because it is not usually an effective use of resources. (Bornstein Affidavit, Exhibit 5, Flynn Deposition, Angus Wright v. City of Milwaukee, Case No. 13-CV-1028, p. 62).

26. In August of 2005, Milwaukee County Circuit Court Judge Charles F. Kahn, Jr. ruled that several persons who had accused then Sergeant Jason Mucha of using excessive force and/or planting drugs could testify in a criminal case where the defendant accused Mucha of similar conduct. (Bornstein Affidavit, Exhibit 6, Michael Tobin Deposition, Angus Wright v. City of Milwaukee, Case No. 13-CV-1028, Exhibit 6).

27. On March 14, 2006, the Wisconsin Court of Appeals issued an opinion reversing the trial court decision that denied a criminal defendant's request to introduce evidence that Mucha had used excessive force and/or planted drugs on other persons. (Bornstein Affidavit, Exhibit 7, <u>State of Wisconsin v. Walter Missouri</u>, 2006 WI. App. 74).

28. The Captain of District 5, Edith Hudson, frequently took Vagnini to meetings conducted by Chief Flynn, with Chief Flynn believing Vagnini to be an effective, productive, successful officer. (Bornstein Affidavit, Exhibit 8, Hudson Deposition, Angus Wright v. City of Milwaukee, Case No. 13-CV-1028, p. 38-39, 84, 99, 115)(Bornstein Affidavit, Exhibit 5, Flynn Deposition, Angus Wright v. City of Milwaukee, Case No. 13-CV-1028, p. 70, 72, 82-83).

29. In March of 2012, when the strip search scandal first came to public light, Chief Flynn stated that the issue of conducting strip searches and body cavity searches was a "serious training issue." (Bornstein Affidavit, Exhibit 5, Flynn Deposition, Angus Wright v. City of Milwaukee, Case No. 13-CV-1028, p. 170).

30. Sergeant Mucha, as then supervisor of Vagnini, received no training on when, or under what circumstances, he could conduct strip or body cavity searches. (Bornstein Affidavit, Exhibit 9, Mucha Deposition, Bohannon v. City of Milwaukee, Case No. 13-CV-1224, p. 101-102).

31. Then Officer Knight believed, while working on the Power Shift Unit at District 5 with Vagnini, that it was proper for an officer to put his hands in a person's pants, including down to his butt crack and testicles, during a search if he felt an object he believed to be drugs. (Bornstein Affidavit, Exhibit 4, Knight Deposition, Bohannon v. City of Milwaukee, Case No. 13-CV-1224, p. 25-28).

32. Then Officer Knight was not taught, either at the police academy or on the job, when, if ever, he could do a body cavity search. (Bornstein Affidavit, Exhibit 4, Knight Deposition, Bohannon v. City of Milwaukee, Case No. 13-CV-1224, p. 32-33).

33. District 5 officers received no training in pat downs while Edith Hudson was captain of that district. (Bornstein Affidavit, Exhibit 8, Hudson Deposition, Angus Wright v. City of Milwaukee, Case No. 13-CV-1028, p. 69-70).

34. On October 8, 2012, the State of Wisconsin criminally charged Vagnini, Knight and Officers Jeffrey Dollhopf and Brian Kozelek with various felonies and/or

7

misdemeanors related to illegal body cavity and strip searches of African American citizens. (Bornstein Affidavit, Exhibit 10, State v. Vagnini, Case No. 12-CF-4984, Criminal Complaint) [**REDACTED**].

35. Vagnini was charged with nine felony counts of misconduct in public office, four felony counts of second degree sexual assault, one felony count of third degree sexual assault, two misdemeanor counts of fourth degree sexual assault, one misdemeanor count of illegal body cavity search and six counts of misdemeanor illegal strip searches. (Bornstein Affidavit, Exhibit 10, State v. Vagnini, Case No. 12-CF-4984, Criminal Complaint) [**REDACTED**]**.**

36. Knight was charged with one felony count of misconduct in public office and one misdemeanor count of illegal body cavity search. (Bornstein Affidavit, Exhibit 10, State v. Vagnini, Case No. 12-CF-4984, Criminal Complaint) [**REDACTED**].

37. On April 22, 2013, Vagnini pled no contest to four felony charges of misconduct in public office and four misdemeanor charges of conducting illegal strip and body cavity searches. (Bornstein Affidavit, Exhibit 11, CCAP Entry Case No. 12-CF-4984) [**REDACTED**]**.**

38. At his sentencing, Vagnini apologized for his actions; said he did not mean to hurt anyone; was sorry that he misinterpreted the law and admitted culpability for the offenses. (Bornstein Affidavit, Exhibit 2, Vagnini Deposition, Venable v. City of Milwaukee, Case No. 13-CV-1114, p. 63-65, 68).

39. On June 21, 2013, Vagnini was sentenced to 26 months in prison and 34

months of extended supervision. (Bornstein Affidavit, Exhibit 11, CCAP Entry Case No. 12-CF-4984) [**REDACTED**].

40. On October 4, 2013, Knight was sentenced to 20 days in the House of Correction, ordered to pay a $300 fine and complete 60 hours of community service. (Bornstein Affidavit, Exhibit 11, CCAP Entry Case No. 12-CF-4987) [**REDACTED**].

41. In 2013, following the John Doe investigation into the conduct of Vagnini and others, Chief Flynn instituted department wide retraining of policies for searches. (Bornstein Affidavit, Exhibit 5, Flynn Deposition, Angus Wright v. City of Milwaukee, Case No. 13-CV-1028, p. 136).

42. Edith Hudson, who was the captain of District 5 from 2008 to 2011, did not know how Sergeant Mucha's unit operated; she never went out with them on the street; she did not know he handled pat down searches; and she made no effort to find out. (Bornstein Affidavit, Exhibit 8, Hudson Deposition, Angus Wright v. City of Milwaukee, Case No. 13-CV-1028, p. 50, 68).

43. Captain Hudson was unfamiliar with this type of proactive policing strategy and other than on one occasion, when executing a search warrant, never went out on the street with these officers to observe their conduct. (Bornstein Affidavit, Exhibit 8, Hudson Deposition, Angus Wright v. City of Milwaukee, Case No. 13-CV-1028, p. 40-42, 50).

44. At his deposition, with respect to supervision of searching techniques at District 5, Knight testified as follows:

9

> "Q. Did he ever discuss with you or anyone else in your unit the proper way to do pat downs and searches?
> A. No.
> Q. Did the lieutenant ever do that?
> A. No.
> Q. You kind of chuck- -- why did you chuckle?
> A. No. Our lieutenants didn't tell us anything.
> Q. Brunson was not involved?
> A. No.
> Q. And Hudson was not involved?
> A. No.
> Q. Captains? So they never told you anything in terms of your procedures or practices with regard to stops and searches or pat downs or anything like that, right?
> A. Like I said before, they just wanted dots.
> Q. They just wanted dots. So they were fine with whatever you did out there. They didn't ask questions, right?
> Q. Is that fair to say?
> A. That's fair to say." (Bornstein Affidavit, Exhibit 4, Knight Deposition, Bohannon v. City of Milwaukee, Case No. 13-CV-1224, p. 181-182).

45. With respect to departmental training regarding how to properly perform searches, Knight testified as follows:

> "Q. Do you feel that you were framed, to some degree, by the Milwaukee Police Department?
> A. Yes. . . .
>
> Q. All right. Would you say that the police department did not properly train you in the areas of searches, that you ultimately got convicted for?
> MR. REAK: Object to form.
> THE WITNESS: I would say they didn't properly train us on strip searches and body cavity searches, yes.
> Q. All right. And is it true that if they had properly trained you in those areas, you wouldn't be – you'd still be on the police department today?
> A. Yes.
> Q. And Vagnini would not be in jail?

10

A. Possibly, yes." (Bornstein Affidavit, Exhibit 4, Knight Deposition, Bohannon v. City of Milwaukee, Case No. 13-CV-1224, p. 185-186).

46. Chief Flynn approved the multiple promotions of District 5 Supervisors Brunson and Hudson, despite the fact that he acknowledged that they presided over a unit at District 5 that committed an "egregious violation of the public trust;" "went rogue;" "broke the law" and violated Milwaukee Police Department policy. (Bornstein Affidavit, Exhibit 5, Flynn Deposition, Angus Wright v. City of Milwaukee, Case No. 13-CV-1028, p. 84-85, 88-96, 155-157).

47. Numerous lawsuits were filed, and settled, in this district by African Americans alleging that Vagnini and other officers in District 5 subjected them to unconstitutional strip and body cavity searches. See Ashford v. City of Milwaukee, Case No. 13-CV-0771.

48. With respect to Milwaukee Police Department training concerning how to retrieve suspected drugs from a suspect as part of a search, Mr. Vagnini testified as follows:

"Q. The technique that you told me about that you used on this occasion with Mr. Newman where you pulled over the front of his pants and then retrieved the baggies, was that part of a technique that you were taught?
A. No. The Milwaukee Police Department doesn't train anything on how to recover drugs. That was never trained to anyone. There was no training on how you – this is how you search someone, and this is how you use a bladed hand between their butt cheeks and between their thighs and blah, blah, blah. And then that's where the training stopped. Well, that's great. How are you supposed to get that cocaine out now?

So that was never discussed. The way I actually learned was other officers talking about it, and then one of the very first cases I

11

ever had with someone having cocaine hidden, it was 2007 I want to say, and Grant Huebner and Dave Stegall – Grant Huebner, ADA, and the Dave Stegall, who doesn't work there anymore I understand, we discussed that case because it went to a motion hearing on it.

    So that's basically where I learned was from them. This is what you can do. You can manipulate it as long as you don't expose anything private. Went through all that. That was probably where I learned the majority of what I learned about things that I could or could not do on the street was not from MPD, it was at the DA's office, because I would sit there and play what–if games all day; if this happens, what about this. And I would learn from them.

    As far as MPD's training, they trained you how to search people, they trained you how to do a pat-down, but there was no this is how you recover drugs, suspected narcotics that are hidden here, here or here.

    And basically the DA's office, when I talked with those guys about it and other DAs, was as long as you don't expose anything private, and you don't have skin-to-skin contact, you're good, in the shortest of terms.

Q. Because if you had skin-to-skin contact with a suspect's genitalia, you exposed their genitalia, that could constitute an illegal strip search?

A. Correct. If a person's privates are exposed or you have skin-to-skin contact intentionally, you know, that's – because there's different things.

Q. The techniques that you used to recover drugs that you became aware of as a result of a pat-down, did you demonstrate those techniques to any of your supervisors in the police department?

A. I don't know that I specifically demonstrated. I would guess that Mucha saw me do it more than once. I mean, he was always around, and we do it all the time.

Q. That's Sergeant Jason Mucha?

A. Correct, sir. And you know, again Jason was probably the biggest proponent of, don't ask anyone here, ask the DA's office. If the DA's office says you can do it, then you can do it. So using – You know, manipulating it with people's clothing, it all basically came down to that last thing. As long as you don't expose anything private, and as long as you're not touching them skin to skin on a private area intentionally, you're basically good.

    So that was always my understanding of the law, and to this day it's still my understanding of the law." (Bornstein Affidavit,

Exhibit 12, Vagnini Deposition, Newman v. Vagnini, Case No. 2:15-cv-01363, p. 81-84).

Dated: September 12, 2016

                                                  Respectfully submitted,

                                                  s/Ronald Bornstein
                                                  Counsel for Plaintiff

BORNSTEIN LAW OFFICES, S.C.
735 North Water Street - Suite 516
Milwaukee WI 53202-4104
(414) 271-1600

## CERTIFICATE OF SERVICE

      I, Ronald Bornstein, an attorney, certify that on September 12, 2016, I filed a copy of Plaintiff's Civil L.R. 56(B)(2)(B)(ii) Proposed Findings of Fact with the Court's CM/ECF electronic filing system and thereby caused a copy of the same to be served on all counsel of record.

                                                  s/Ronald Bornstein
                                                Counsel for Plaintiff