# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

WILLIE JAMES NEWMAN,

                Plaintiff,

v.

MICHAEL VAGNINI, JEFFREY CLINE,
PAUL MARTINEZ, and
CITY OF MILWAUKEE,

                Defendants.

Case No. 15-CV-1363-JPS

ORDER

## 1.    INTRODUCTION

On August 12, 2016, the defendants Michael Vagnini ("Vagnini"), Jeffrey Cline ("Cline"), Paul Martinez ("Martinez") (collectively the "Officer Defendants"), and the City of Milwaukee (the "City") filed a motion for partial summary judgment as to the plaintiff Willie James Newman's ("Newman") *Monell* claims. (Docket #19). The defendants submitted a combined statement of facts and brief in support, as well as supporting affidavits. (Combined Statement of Facts and Brief in Support, Docket #20; Affidavits, Docket #21, #22, #23, #24, #25, and #26). On September 12, 2016, Newman offered his brief in opposition to the motion, a response to the statement of facts, his own statement of facts, and an affidavit of counsel attaching various exhibits. (Brief in Opposition, Docket #27; Response to the defendants' Statement of Facts ("RSOF"), Docket #28; Newman's Statement of Facts, Docket #29; Affidavit, Docket #30). On September 29, 2016, the defendants submitted a reply in support of their motion, a response to Newman's statement of facts, and additional affidavits. (Reply in Support, Docket #31; Response to Newman's Statement of Facts ("RPSOF"), Docket

#34; Affidavits, Docket #32 and #33). The motion is fully briefed and, for the reasons explained below, it will be granted.

2.      STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides the mechanism for seeking summary judgment. Rule 56 states that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A "genuine" dispute of material fact is created when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court construes all facts and reasonable inferences in a light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). In assessing the parties' proposed facts, the Court must not weigh the evidence or determine witness credibility; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chicago Transit Authority*, 618 F.3d 688, 691 (7th Cir. 2010).

3.      RELEVANT FACTS

The facts are largely undisputed, and those that are disputed are generally not material to the disposition of this motion. The Court will provide a discussion of relevant topics, noting the parties' disputes where appropriate. In accordance with the standard of review, the facts are viewed in a light most favorable to Newman.

3.1      The Search

In the early morning of April 30, 2010, Newman was sitting in his car in a restaurant parking lot when multiple police squad cars entered the  lot.

RPSOF ¶¶ 2-5.[1] Vagnini and other officers approached Newman's car and ordered him out of it at gunpoint. RPSOF ¶ 6. Newman testified that after he got out, "I was searched by an officer, then Officer Vagnini said the search wasn't good enough. Therefore, he walked up to me, unbuckled my belt, my pants, pulled my pants down to my knees with my underwear, and he went in my private area, my genitals, with his bare hands, and he searched me[.]" RPSOF ¶ 7.[2]

### 3.2 District Five Policing

The Milwaukee Police Department's ("MPD") District Five covers an area of the city which is ninety percent African-American. RPSOF ¶ 8. Beginning in 2010, an anti-gang unit comprised entirely of white police officers, including the Officer Defendants, was created to do "proactive policing" in District Five. RPSOF ¶¶ 9-10, 12-13. This unit was led by Sergeant Jason Mucha ("Mucha").[3] RPSOF ¶ 11. On a typical day, "proactive

---

[1]Citations to responsive fact documents is for brevity only; the cite may refer to material in the asserted fact and/or the response.

[2]The defendants contest Newman's account of the search, claiming that his pants were not pulled down nor any guns drawn, but this dispute is not relevant to the disposition of their motion. RPSOF ¶¶ 3, 6, 7. Thus, this is not a dispute of material facts precluding summary judgment, but instead a set of non-material facts which may be construed in Newman's favor for the purposes of this order.

[3]In 2005 and 2006, various Wisconsin courts ruled that certain criminal defendants could introduce evidence that Mucha had used excessive force and/or planted drugs on other people. RPSOF ¶¶ 26-27.

policing" involved use of the "train" strategy. RPSOF ¶¶ 14-16.[4] In the train strategy, the lead car, usually Vagnini, would be responsible for selecting vehicles to stop or persons to be interviewed. RPSOF ¶ 18.[5] The train strategy led to more traffic stops and individual interviews, which in turn increased the likelihood of searches being conducted. RPSOF ¶ 23. The train strategy was discontinued in District Five on March 20, 2012, because the anti-gang unit officers were suspended by the MPD. RPSOF ¶ 17.[6] By March 21, 2012,

---

[4]The defendants dispute who coined the term "the train." RPSOF ¶ 15. This semantic disagreement is of no moment. They further dispute that the strategy, whether called a "train" or something else, was a formal strategy used by the MPD. RPSOF ¶¶ 16, 18. This is belied by Gregory Kuspa's ("Kuspa") testimony on how the anti-gang unit operated:

> Q:   So you would leave the district and go out on patrol [on a typical day]?
> A:   Yes. Not every day, but –
> Q:   Typically?
> A:   A typical day – if we had something going on maybe from the night before, we'd stay in and work on it. Otherwise, we would get together and go on the street.
> Q:   And you would patrol in a line of cars?
> A:   For the most part, yes.
>                                    . . .
> Q:   Whose idea was it to patrol the neighborhood in a train of cars like that?
> A:   It's actually a strategy - I don't know if it was made up by this person or  if  he  may  have  got  it  from somewhere[.]

(Docket #30-3 at 31:6-32:110) (emphasis added); *see id.* at 29:22-35:25.

[5]The defendants' disputes are again undermined by Kuspa's testimony. *See supra* note 4.

[6]*See supra* notes 4 and 5.

the media began widespread reporting of the strip search scandal. RSOF ¶¶ 30-31.

### 3.3 Chief Flynn's Involvement

Milwaukee Police Chief Edward A. Flynn ("Flynn") took that position in 2008. Once the anti-gang unit began operating, Flynn attended meetings with Vagnini and other officers. Those officers would report on the meetings to the other members of the anti-gang unit. RPSOF ¶ 19. This included Jacob Knight ("Knight"), with whom they discussed the directives issued in those meetings. RPSOF ¶ 20. They told Knight that Flynn and the other command staff "wanted dots on a map," meaning traffic stops and individual interviews, "so they could say that something was being done by the police." RPSOF ¶ 21. This coincided with the strategy employed after Flynn became chief in 2008, which was that after a serious crime occurred in an area, the police would "saturate" the area, conducting additional traffic stops and interviews. RPSOF ¶ 22. The defendants claim that this strategy may not have preceded Flynn taking office. RPSOF ¶ 22.

Flynn did not, however, know that the train strategy was being employed by the anti-gang unit until 2012. RPSOF ¶ 24. If he had, Flynn would have stopped its use because it is not an effective use of limited police resources. RPSOF ¶ 25. Newman concedes that Flynn was not actually aware of the strip search issue prior to March 2012, but maintains that he should have been aware. RSOF ¶¶ 32-33.

In March 2012, after the strip search scandal broke, Flynn told the media that the issue of strip and body cavity searches was a "serious training

issue." RPSOF ¶ 29.[7] He further commented that the strip search scandal was "an egregious violation of public trust," that the officers involved "went rogue," and that they "broke the law" and violated MPD policy. RPSOF ¶ 46. Nevertheless, Flynn had approved multiple promotions for the supervisors of District Five. RPSOF ¶ 46.

### 3.4 MPD Investigation

In early 2012, Captain David Salazar ("Salazar") was assigned to the MPD Internal Affairs division, where he investigated citizen complaints against police officers. RSOF ¶¶ 7-8. On January 31, 2012, Salazar received two complaints directed at Vagnini for unlawful search practices during a traffic stop. RSOF ¶¶ 9-11. Salazar reviewed Vagnini's records which revealed similar allegations from March 5, 2010, and sometime in 2011. RSOF ¶¶ 12-13, 15. The March 5, 2010 complaint was investigated, found unsubstantiated, and closed. RSOF ¶ 14. The 2011 complaint was investigated and turned over to the Milwaukee County District Attorney for prosecutorial review, but no charges resulted, and that complaint was not otherwise pursued. RSOF ¶¶ 16-19.

Upon review of these complaints, Salazar determined that they might show a pattern of unlawful behavior by Vagnini. RSOF ¶ 20. He ordered that

---

[7]The defendants assert that Flynn disagrees with Newman's characterization of this statement. RPSOF ¶ 29. From the partial transcript provided to the Court, it appears that Flynn actually made the statement in May 2012. (Docket #30-5 at 170:4-19). However, as of the time of his deposition, Flynn was unable to agree that "at least at that point in time in May, you considered it to be, at the very least, a very serious training issue[.]" *Id.* at 170:20-22. Flynn responded that "[t]his is a quote without any context. I don't know what the question is that I was being asked. I don't recall if I was being asked a theoretical [end of document][.]" *Id.* at 170:23-25. Given this inconsistency and limited record, the testimony *can* support the fact that the statement was made, but *cannot* support the implication sought by Newman that Flynn still agrees with the statement.

the old complaints be opened and reinvestigated, as well as an investigation of the new complaints. RSOF ¶¶ 21-22. Salazar kept his superiors informed of the status of his investigation and also contacted the Milwaukee County District Attorney for advice on the possibility of criminal charges against Vagnini. RSOF ¶¶ 25-26.

Flynn was first fully briefed regarding the Vagnini investigation on March 19 or 20, 2012. RSOF ¶ 27. By that date, Newman had not filed any complaints against the Officer Defendants.[8] RSOF ¶¶ 23-24. Immediately after the briefing, Flynn suspended Vagnini and the rest of the anti-gang unit. RSOF ¶ 28. In 2013, Flynn instituted MPD-wide retraining on policies related to searches. RPSOF ¶ 41.

### 3.5 Officers' Criminal Prosecutions and Civil Lawsuits

In late 2012, Vagnini, Knight, Jeffery Dollhopf, and Brian Kozelek were criminally prosecuted for their roles in illegally searching persons in District Five. RPSOF ¶ 34.[9] Vagnini was charged with various sexual assault and illegal search felonies and sentenced to over two years in prison. RPSOF ¶¶ 35, 37, 39. At his sentencing, Vagnini apologized for his actions and said he had "misinterpreted the law." RPSOF ¶ 38. Knight was charged with lesser felonies and received a much lighter sentence. RPSOF ¶¶ 36, 40. Numerous civil lawsuits have been filed and settled in this District since 2013 involving Vagnini and the other anti-gang unit officers with regard to their allegedly unconstitutional strip and body cavity searches. RPSOF ¶ 47.

---

[8]In fact, Cline and Martinez had no history of complaints regarding unlawful searches. RSOF ¶ 24.

[9]Newman claims that they were prosecuted for searching African-Americans, but the defendants note that the criminal charges, including that for Vagnini provided as an exhibit, do not specify the race of the victims. RPSOF ¶ 34; (Docket #30-10).

### 3.6    Officers' Training and Supervision

The MPD trains its officers using the Wisconsin Law Enforcement Officers Criminal Law Handbook ("Handbook") which includes information on conducting searches. RSOF ¶ 34. The Handbook states that a frisk or pat down search may be used if an officer reasonably suspects that the person is dangerous. RSOF ¶ 35. The Officer Defendants were trained on this point and understood that the primary purpose of such searches was to find concealed weapons. RSOF ¶¶ 38-39.

As to strip searches, the Handbook provides that they may be conducted if the requirements of Wisconsin Statute Section 968.255 are met. RSOF ¶ 36.[10] These are, *inter alia*, that the person searched must be arrested and not exposed to anyone not involved in the search. Wis. Stat. § 968.255(b)(2)(ag) and (b). Further guidance is found in the MPD Standard Operating Procedure ("SOP") on strip searches, in effect since April 2010, which states that strip searches must have approval from a captain (or higher authority) and can only occur with probable cause that a person "has secreted a weapon or evidence." RSOF ¶ 37. The SOP defines a strip  search as one "in which a detained person's genitals…[are] uncovered and either exposed to view or touched by a person conducting the search." RSOF ¶ 37.

The Officer Defendants have submitted affidavit testimony that they understood the definition of a strip search and the above-described rules on conducting them. RSOF ¶¶ 40, 42. They further testified that they knew it was unlawful to pull down a subject's pants in public to conduct a search or have skin-to-skin contact with a subject's genitalia while retrieving a secreted

---

[10]This fact includes a typographical error, mistakenly referencing a non-existent Section 968.225. The Handbook correctly cites Section 968.255, which governs strip searches.

item. RSOF ¶¶ 43-44. Finally, they testified that they knew violating department rules and/or state and federal law was not tolerated by Flynn, and that such violations could result in discipline and criminal prosecution. RSOF ¶ 45.

Newman denies the truth of the Officer Defendants' affidavit testimony on strip searches, offering conflicting evidence regarding their training. RSOF ¶¶ 40, 42, 44. Newman asserts that Mucha testified that he received no training on when or under what circumstances he could conduct strip or body cavity searches. RPSOF ¶ 30. The defendants counter that his testimony falls short on this point; Mucha does not state that he *never* received such training, and otherwise testified that he was aware of the strip search SOP. RPSOF ¶ 30. Edith Hudson ("Hudson"), the captain of District Five while the anti-gang unit was in place, could not recall in her 2014 deposition whether any officers in that district received training on conducting pat down searches. RPSOF ¶ 33. She further testified that pat down searches were not "something that again was brought to my attention as an issue." (Docket #30-8 at 69:21-23).

Knight believed that if an officer searched a person and felt something he believed to be drugs, the officer could put his hands down the person's pants to find and remove the object. RPSOF ¶ 31. Knight stated that he used interior layers of clothing, such as underwear, as a barrier between him and the person's genitalia, and that his efforts would be directed at manipulating the drugs, not touching the person. RPSOF ¶ 31. Knight was not taught at the police academy or while working with the MPD about when strip and body cavity searches were appropriate or how to perform them. RPSOF ¶¶ 32,

45.[11] Knight testified that his superiors did not teach him the proper method for pat downs and searches, and that they were instead focused on getting "dots" and did not ask questions on how the anti-gang unit obtained those "dots." RPSOF ¶ 44.

Vagnini testified that his training was also deficient. He stated that the technique he used to search Newman was not taught by the MPD. RPSOF ¶ 48. Vagnini claimed that he was trained on how to search people and conduct pat downs, but received no training on how to recover drugs hidden in various places on a person. RPSOF ¶ 48. Instead, he spoke with two Wisconsin district attorneys in 2007, who informed Vagnini that in a lawful search, he could "manipulate" a person's butt and genitals through their clothing "as long as you don't expose anything private" or have skin-to-skin contact with the person. RPSOF ¶ 48. Vagnini did not demonstrate this technique to his MPD supervisors, but Mucha observed Vagnini using it and did not object. RPSOF ¶ 48.

With regard to officer supervision, Hudson did not know how Mucha ran the anti-gang unit, but she was not notified of problems with pat down searches and would have relied on her lieutenants to bring such an issue to her attention. RPSOF ¶ 42. Hudson was unfamiliar with the "train" strategy they were employing and only went out with them one time while she was captain of District Five. RPSOF ¶ 43.

4.    ANALYSIS

---

[11]The defendants dispute whether Knight was taught that he *could* perform a cavity search, but that does not undermine Newman's asserted fact.

Three claims remain in Newman's lawsuit.[12] First, Newman alleges that Vagnini unlawfully searched him. (Docket #1 at ¶¶ 34-35). Second, Newman asserts that Cline and Martinez failed to intervene to stop Vagnini's unconstitutional search. *Id.* at ¶¶ 36-37. Finally, Newman contends that the City bears liability for implementing an unconstitutional policy, namely failing to appropriately train or supervise the Officer Defendants. *Id.* at ¶¶ 38-42. The defendants contest the first two claims but recognize that disputes of material fact exist for each. (Docket #20 at 2-3). Thus, the instant motion is directed solely at the City's liability. (Docket #19).

Local government entities, such as municipalities and counties, cannot be held vicariously liable for constitutional violations committed by their employees. *Monell v. Dept. of Social Services of City of New York*, 436 U.S. 658, 690 (1978). Such entities can, nevertheless, be liable under Section 1983 if "the unconstitutional act complained of is caused by: (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Thomas v. Cook County Sheriff's Dept.*, 604 F.3d 293, 303 (7th Cir. 2009) (citing *Monell*, 436 U.S. at 690).

The City will bear liability for its policies if Newman can show that it was deliberately indifferent to the known or obvious consequences of those policies, i.e., that they would cause unconstitutional harm. *Thomas*, 604 F.3d at 303. Such policies must also be the "moving force" behind the constitutional violation. *Estate of Sims v. County of Bureau*, 506 F.3d 509, 514 (7th Cir. 2007). Liability can arise from both implementing an

---

[12]A number of claims and defendants were dismissed on July 19, 2016, pursuant to the parties' stipulation. (Docket #17).

unconstitutional policy and failing to establish a policy "in situations where rules or regulations are required to remedy a potentially dangerous practice[.]" *Thomas*, 604 F.3d at 303. The Seventh Circuit has not established "any bright-line rules defining a 'widespread custom or practice,'" other than that "the plaintiff must demonstrate that there is a policy at issue rather than a random event." *Id.* Once that threshold is reached, "the jury must make a factual determination as to whether the evidence demonstrates that the [municipality] had a widespread practice that [caused] the alleged constitutional harm." *Id.*

Newman asserts a *Monell* claim on two grounds: one for failure to train and another failure to supervise. They are assessed under the same standard. For these *Monell* derivatives, "the inadequacy of police training [or supervision] may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). The *Dunn* court explained:

> Deliberate indifference may be shown in one of two ways. First, a municipality shows deliberate indifference when it fails to train its employees to handle a recurring situation that presents an obvious potential for a constitutional violation and this failure to train results in a constitutional violation. Second, a municipality shows deliberate indifference if it fails to provide further training after learning of a pattern of constitutional violations by the police.

*Dunn v. City of Elgin, Illinois*, 347 F.3d 641, 646 (7th Cir. 2003) (citations omitted). In other words, "[i]t may happen that…the need for enhanced training is so obvious, and the inadequacy of training is so likely to result in the violation of constitutional rights, that a jury could reasonably attribute to the policymakers a deliberate indifference to those training needs." *Tapia v.*

*City of Greenwood*, 965 F.2d 336, 338 (7th Cir. 1992) (quoting *Erwin v. County of Manitowoc*, 872 F.2d 1292, 1298 (7th Cir. 1989)). Crucially, "[Newman] must show that the failure to train [or supervise] reflects a conscious choice among alternatives that evinces a deliberate indifference[.]" *Rice ex rel. Rice v. Correctional Medical Services*, 675 F.3d 650, 675 (7th Cir. 2012).

Preliminarily, the Court makes three observations which constrain its ruling. First, as noted above, it must take Newman's description of the search as true. Although the Officer Defendants dispute his account, their dispute only prohibits summary judgment on the unlawful search and failure to intervene claims (which they do not seek here anyway). Thus, in evaluating Newman's *Monell* claim, the Court must begin by believing his story, then move on to assess his *Monell* evidence. Second, the Court notes the limited scope of Newman's *Monell* claim. He does not assert that the City itself had a policy of promoting the use of unlawful strip searches on African-American males. Instead, the "policy" at issue is the City's failure to properly train or supervise the anti-gang unit which conducted those unlawful searches. Finally, the parties appear to agree that Flynn is the relevant policymaker and is, therefore, the "the City" for the purposes of the *Monell* claim; for instance, if Flynn knew that the anti-gang unit was being inadequately trained or supervised, the City would be liable. *See* (Docket #20 at 24-26; Docket #27 at 14-17; Docket #31 at 4).

With those points in mind, the Court finds that Newman has failed to raise an issue of material fact to prevent summary judgment against him. The parties primarily dispute whether the Officer Defendants actually received the training that the City provides on the strip search issue, such as the Handbook policies and SOP. They further dispute whether their on-the-job experience overrode or failed to supplement that training. Newman

specifically asserts that Flynn's proactive policing policy "was done without training [the Officer Defendants] in how to properly perform strip searches, and without providing supervision to [*sic*] insure that the recurring pat downs and searches were performed in a constitutionally permissible manner." (Docket #27 at 17).

The Court is not convinced that Newman has raised more than a scintilla of evidence on the deficiency of the Officer Defendants' training or supervision.[13] *See Roger Whitmore's Auto. Services, Inc. v. Lake County, Illinois*, 424 F.3d 659, 669 (7th Cir. 2005). However, Newman's claim fails for a different reason. As noted above, Newman's claim requires that the City display deliberate indifference in failing to train or supervise. This in turn mandates that Newman prove that the City—here Flynn—made the following conscious choices: 1) to implement the relevant training and supervision, knowing of the great risk of constitutional violations; 2) enact the proactive policing policy, again with the knowledge that this would exacerbate the constitutional risk; and 3) refuse to change the policy or update the training or supervision after learning of their inadequacy. The undisputed evidence presented here shows that the opposite is true.

As to the first and second choices, Newman has not shown that Flynn knew that the manner of training the Officer Defendants on handling strip searches "present[ed] an *obvious* potential for a constitutional violation[.]"

---

[13]Further, it seems highly unlikely that Newman could show that a failure to train or supervise was the "moving force" behind his constitutional injury, given the Officer Defendants' affidavit testimony that they knew of the Handbook and SOP rules and knew that violating them was punishable. It appears that they simply ignored those rules, and thus the "moving force" was Vagnini, not the City. *See Wilson v. Cook County*, 742 F.3d 775, 780 (7th Cir. 2014). Again, though, Newman's claim fails for other reasons.

*Dunn*, 347 F.3d at 646 (emphasis added). The training, including the Handbook and SOP policies and that provided by district attorneys, is not facially deficient, although Newman attempts to assert its failings by splitting hairs. Specifically, he claims that the proactive policing policy "created a recurring situation that presented an obvious potential for constitutional violations[, because the] subordinate police officers did not receive training in how to recover suspected narcotics detected as part of the search[.]" (Docket #27 at 16). However, the policies broadly prohibit strip searches of the variety alleged here; they more than adequately instruct an officer that he may not to strip search a person in public or have skin-to-skin contact in an effort "to recover suspected narcotics detected as part of the search[.]" *Id.* As to the third choice, there is no evidence that Flynn knew of any strip search issues until 2012, and once Salazar completed his investigation and briefed him, Flynn suspended the anti-gang unit and instituted MPD-wide retraining on searches. On the state of the record, the City cannot bear *Monell* liability for a strip search problem that was not obvious and that it did not know about until well after Newman's complained-of search.

Newman's other arguments fail. He asserts that after "Vagnini's unconstitutional conduct at District 5 became known to Chief Flynn, he, by inference, ratified this conduct by promoting Vagnini's then supervising officers." (Docket #27 at 15-16). This is, however, not buttressed by any evidence on the circumstances of the promotions or why they occurred. Given the dearth of support, the Court cannot conclude that such an inference would be reasonable. Newman also contends that, although Flynn did not actually know about the Officer Defendants' misconduct prior to 2012, he should have known. RSOF ¶¶ 32-33. Again, the deliberate

indifference standard negates this argument. It was impossible for Flynn to make a conscious choice regarding an issue he was not actually aware of.

5.    CONCLUSION

Newman has not shown that the strip search issue was obvious at the outset of Flynn's proactive policing program. Further, Newman has not disputed that Flynn was unaware of the strip search issue until well after he was allegedly subjected to an improper strip search. Thus, he cannot maintain a *Monell* claim against the City for failure to train or supervise the Officer Defendants prior to their alleged constitutional violation. While this result may differ from that in previous strip search cases involving Vagnini, the Court must decide the defendants' motion on the undisputed evidence before it and is not at liberty to seek relevant evidence elsewhere; the Court cannot do Newman's work for him.

Accordingly,

IT IS ORDERED that the defendants' motion for partial summary judgment (Docket #19) be and the same is hereby GRANTED;

IT IS FURTHER ORDERED that the plaintiff's *Monell* claim against the defendant City of Milwaukee (Docket #1 at ¶¶ 38-42) be and the same is hereby DISMISSED; and

IT IS FURTHER ORDERED that the defendant City of Milwaukee be and the same is hereby DISMISSED from this action with prejudice.

Dated at Milwaukee, Wisconsin, this 18th day of October, 2016.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge