# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

WILLIE JAMES NEWMAN,

                Plaintiff,

v.

MICHAEL VAGNINI, JEFFREY CLINE,
and PAUL MARTINEZ,

                Defendants.

Case No. 15-CV-1363-JPS

**ORDER**

## 1.    INTRODUCTION

On November 23, 2016, the jury returned its verdict in this matter in favor of Plaintiff Willie James Newman ("Newman"). (Docket #62). On January 11, 2017, pursuant to the briefing schedule established by the Court, Defendants Michael Vagnini ("Vagnini"), Jeffrey Cline, and Paul Martinez ("Martinez") (collectively, "Defendants") filed a motion to vacate the jury's verdict. (Docket #92). The motion is now fully briefed, and for the reasons explained below, it will be granted in part and denied in part.

## 2.    STANDARD OF REVIEW

Federal Rule of Civil Procedure ("FRCP") 59 permits a party to seek a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). In clearer terms, this means that "[a] new trial is appropriate if the jury's verdict is against the manifest weight of the evidence or if the trial was in some way unfair to the moving party." *Venson v. Altamirano*, 749 F.3d 641, 656 (7th Cir. 2014). FRCP 60 allows the Court to vacate a judgment based on, *inter alia*, a mistake, newly discovered evidence, fraud by a party, satisfaction of the judgment, or "any other reason that justifies relief." Fed. R. Civ. P. 60(b).

Relief under FRCP 60 is an "extraordinary remedy and is granted only in exceptional circumstances." *Wickens v. Shell Oil Co.*, 620 F.3d 747, 759 (7th Cir. 2010). Under both rules, the Court's determination is constrained only by its sound discretion. *Venson*, 749 F.3d at 651, 656.

3.     **ANALYSIS**

Defendants offer two primary arguments in favor of vacating the jury's verdict. First, they claim that a juror's conduct tainted the jury's verdict, denying them a fair trial. Second, they contend that even if the verdict stands, both the compensatory and punitive damages awards are excessive and must be reduced. The Court addresses these arguments in turn.

### 3.1     Juror Misconduct

Defendants challenge the verdict based on alleged juror misconduct, namely that a juror, who will be identified as Juror Number One, conducted internet research during the trial which influenced the jury's deliberations. On December 8, 2016, Defendants filed a motion requesting that the Court question that juror. (Docket #67). The Court referred the motion and evidentiary hearing to Magistrate Judge William E. Duffin, who granted the motion to question the juror and issued a report on his evidentiary findings after holding a sealed hearing (the "Report"). (Docket #81). The Court will first address the Report and then moves on to the substance of the parties' arguments on the misconduct issue.

### 3.1.1     Magistrate Duffin's Report

Defendants filed their motion to question Juror Number One in light of information found by their attorneys on the juror's publicly available Facebook postings. *Id.* at 2. After receiving the verdict, Defendants' counsel directed their staff to conduct internet research on the jurors. *Id.* This included viewing Juror Number One's public Facebook postings. *Id.* On November 26,

2016, three days after jury's verdict was received, Juror Number One posted a link to a local television station's report on the verdict. *Id.* at 3-4. The next day, a person commented on that post, stating:

> Why don't you become a judge? If you can sit through that ish [sic] and not lose your ish- you should just be the judge. You researched the payouts of similar cases. You have a psychology background and can tell when people are b.s.ing. You could do a lot of good everyday. What if you made it to the supreme court?

(Docket #69-1 at 21). Juror Number One replied to the comment, "Maybe some day!" *Id.*

Given the content of the Facebook post, Defendants requested that Juror Number One be questioned to determine "whether extraneous prejudicial information was improperly brought to [the jury's] attention." (Docket #67 at 1). Magistrate Duffin issued the Report on December 19, 2016, and Newman submitted objections thereto on January 3, 2017. (Docket #90 and #91). The Report is subject to *de novo* review. 28 U.S.C. § 636(b)(1).

Newman presents two objections. First, he suggests that Magistrate Duffin erred in determining that Defendants' Facebook research was appropriate. The Court agrees with Magistrate Duffin. General Local Rule 47(c) prohibits parties or their agents from "approach[ing], interview[ing], or communicat[ing] with a venire member or juror, before, during or after trial, except on leave of Court granted upon notice to opposing counsel and upon good cause shown." Gen. L. R. 47(c). There is no evidence that Defendants or their counsel communicated with any juror in conducting their research. Further, Defendants accessed only what information the jurors themselves made available by posting it to the public portion of their Facebook profile. While the Court recognizes Newman's concern regarding overly intrusive

post-verdict investigations, that simply did not occur here. The undeniable fact that the internet makes so much information so readily available does not render accessing such information improper.[1]

Newman's second objection is to Magistrate Duffin's finding on the witnesses' credibility. Magistrate Duffin conducted a sealed evidentiary hearing wherein he questioned Juror Number One as well as the jury's foreperson. (Docket #81 at 5-6). In light of the strong policy reasons against intruding on a jury's deliberations, *Tanner v. U.S.*, 483 U.S. 107, 117-28 (1987), Magistrate Duffin limited his questioning to the issue of "whether any matter not presented as evidence at trial was nonetheless improperly presented to the jury, . . . avoid[ing] any questions about what role any such outside information played in the jury's deliberations[.]" (Docket #81 at 4). Magistrate Duffin found as follows:

> The court questioned Juror Number One. Juror Number One authenticated the posts contained in ECF Nos. 69-1 and 69-2 as coming from her Facebook page. She testified that she did not conduct any outside research during the trial. However, she testified she is a "researcher by nature" and, therefore, immediately following the completion of the trial on November 23, 2016, she researched what victims of police misconduct, including victims of unlawful strip searches, received in other cases. It was this research that the commenter on her post, whom she characterized as her best friend, was referring to on Facebook. When asked if she shared with other jurors anything that she learned from any outside research, she

---

[1] Newman equates Defendants' internet research to "having undercover officers discretely follow the jurors, post-verdict, and eavesdrop on the jurors' conversations with other people, in public places[.]" (Docket #91 at 2). That analogy is inapposite. A public Facebook posting is not a private conversation between two persons on the street, but is akin to using a megaphone to shout one's thoughts to anyone within earshot. In fact, if the posting is truly public (depending on how a person decides to issue the post), it may be accessible to *anyone* across the globe who has access to Facebook.

said she did not. She denied having any knowledge of the actors in this case prior to trial or conducting any research regarding any of them during the trial.

The court then questioned the jury foreperson. The foreperson denied that any juror provided the jury information as to what compensation persons in similar cases received. However, the foreperson testified that, on the second day of deliberations, Juror Number One asked if the jury would like to know what she learned by doing research about awards in other civil actions. The jury members agreed they would and Juror Number One provided information as to what she learned in her research. The foreperson did not have a specific recollection of what information Juror Number One provided but did recall that the cases were not related to police misconduct; they might have been employment discrimination cases. The foreperson did not know when Juror Number One undertook such research and did not know Juror Number One's source, although the foreperson suspected it was the internet. It was the foreperson's belief that Juror Number One was not providing information based upon her personal experience.

The court finds that the testimony of the two witnesses to be in conflict. Based upon the court's observations of the witnesses during the hearing, the testimony of the witnesses, and evidence presented with the defendants' motion, the court finds that the greater weight of the credible evidence supports the finding that Juror Number One *did* do research on payouts in other civil actions during the trial and before the jury rendered its verdict. The court finds the foreperson's testimony more credible to the extent that it conflicts with that of Juror Number One.

*Id.* at 5-6.

Newman contends that Magistrate Duffin's finding of conflict between the two jurors' testimony is erroneous. Juror Number One testified that she did not do any research during the trial nor did she share that information with her fellow jurors. (Docket #91 at 3-8). Defendants counter that this

testimony is contrary to that of the foreperson, as noted by Magistrate Duffin. (Docket #94 at 4-8). In essence, according to Defendants, Magistrate Duffin concluded that Juror Number One's testimony was untruthful. *Id.* at 6.

Newman's objection on this point is overruled to the extent that he asserts that there was no conflict between the testimony of the witnesses. The Court has reviewed the transcript of the sealed hearing and agrees with Magistrate Duffin that the conflict is apparent. Juror Number One testified that she did not share any of her research with her fellow jurors, while the foreperson testified that she in fact volunteered such information. (Docket #88 at 8-9, 13-14).

However, there remains the issue of the timing of Juror Number One's research. This raises several interrelated questions. Did Juror Number One do any research on research on "the payouts of similar cases"? Yes, and the juror confirmed as much, though as both witnesses testified, the word "similar" meant other civil cases generally, not strip search cases in particular. *Id.* at 6-10, 12-13. Specifically, the foreperson testified that the cases "may have been an employer/employee sexual misconduct-type case, and they were not in Wisconsin; it was like Florida or, you know, someplace else entirely[.]" *Id.* at 13. Next, did Juror Number One do research on Defendants at any time prior to the jury's verdict? No; Juror Number One testified that she did not and the foreperson confirmed that such research was never discussed in the jury's deliberations. *Id.*

The final question, then, is whether Juror Number One conducted research on "similar cases" *during* the trial (hereinafter, this is the "research" the Court references). Magistrate Duffin says yes, finding that "the greater weight of the credible evidence supports the finding that Juror Number One *did* do research on payouts in other civil actions during the trial and before

the jury rendered its verdict." (Docket #81 at 6). This Court finds that on the record before it, Magistrate Duffin's conclusion was mistaken. Juror Number One testified at various points that she did not do any research during the trial:

> THE COURT: Okay. Let me ask you, specifically during the time period from when the trial started, so beginning on or about 9:00 a.m. on Monday morning --
> [JUROR NUMBER ONE]: Uh-huh.
> THE COURT: November 21st --
> [JUROR NUMBER ONE]: Uh-huh.
> THE COURT: -- and you guys reached a verdict, were done by roughly noon on Wednesday --
> [JUROR NUMBER ONE]: Correct.
> THE COURT: -- during that time period, so from the beginning of the trial to when the jury came back with its verdict, did you do any research, investigation or search relating to what compensation people received or should receive after being subjected to illegal strip searches or other cases of police misconduct?
> [JUROR NUMBER ONE]: No.
> . . .
> THE COURT: Okay. I think you probably -- this is probably encompassed within what you've already said, but did you during the trial -- so between the beginning of the trial and the reaching of a verdict, did you do any research in any way whether it's internet research or otherwise related to any person involved in the case?
> [JUROR NUMBER ONE]: No.
> . . .
> THE COURT: So when [the Facebook post commenter] was talking about the research she did -- that you did, you're talking -- she's referencing what you told her about the research that you did after the case was over?
> [JUROR NUMBER ONE]: Well, she knows that I research everything; but also I twice took the LSAT prep course, which I did not complete; and so she knows that I'm already knowledgeable of several cases and things like that.
> THE COURT: Independent of this case?

[JUROR NUMBER ONE]: Independent. This is years ago, yes. Correct. But she knows that I'm -- that's who I am. I know a lot about other things, which I have a paper that -- I know that they --
THE COURT: That's okay.
[JUROR NUMBER ONE]: Okay.

(Docket #88 at 7-8, 9-10). None of this testimony states that any research was conducting during the trial, and in fact, the final quoted portion suggests that the research occurred long before the trial. *Id.* at 10 ("Independent. This was years ago, yes."). Understandably, the foreperson had nothing to say on the timing of Juror Number One's research; the foreperson testified only that the information was apparently internet research and not, for instance, stemming from a case involving Juror Number One herself. *Id.* at 14-15.

Therefore, the Court is unable to find that Juror Number One's research was conducted during the trial, and is therefore obliged to sustain Newman's objection as to the timing of this research.

### 3.1.2 Extraneous Information and Prejudice

Defendants' motion to vacate first argues that Juror Number One's research brought extraneous, prejudicial information into the jury's deliberations. When "a jury is exposed to material not admitted into evidence," the losing party "is only entitled to a new trial if there is a reasonable possibility that the evidence had a prejudicial effect upon the jury's verdict." *United States v. Berry*, 92 F.3d 597, 600 (7th Cir. 1996). The question becomes "the degree and pervasiveness of the prejudicial influence possibly resulting from the jury's exposure to the extraneous material." *Id.* (quotation omitted). The Court must remember that this inquiry is strongly disfavored and must therefore be extremely limited. *Tanner*, 483 U.S. at 127.

The first hurdle Defendants must pass is a showing that Juror Number One's research was "extraneous" to this case.[2] The Seventh Circuit explains the relevant inquiry:

> This Circuit has held that while due process may require some sort of hearing to determine whether extraneous contacts may have affected a jury's ability to be fair, the standard applies only to prejudicial extraneous contacts, and *not* to preexisting juror bias. In the due process context, the tool for examining an intrinsic influence like juror bias is voir dire.
>
> [A juror's] prior experience with an ankle injury constitutes an intrinsic influence that does not require an evidentiary hearing, let alone a new trial. *See Marquez v. City of Albuquerque*, 399 F.3d 1216, 1223 (10th Cir. 2005) ("[A] juror's personal experience does not constitute extraneous prejudicial information."); *Peterson v. Wilson*, 141 F.3d 573, 577-78 (5th Cir. 1998) (holding that juror discussion of personal past experience is not "extrinsic" evidence that requires a new trial). Moreover, jurors are expected to bring commonly known facts and their experiences to bear in arriving at their verdict. "We cannot expunge from jury deliberations the subjective opinions of jurors, their attitudinal expositions, or their philosophies. These involve the very human elements that constitute one of the strengths of our jury system." *Shillcutt v. Gagnon*, 827 F.2d 1155, 1159 (7th Cir. 1987) (internal quotations omitted). Although jurors may not go beyond the record to develop their own evidence, they are entitled to evaluate the evidence presented at trial in light of their own experience.

*Arreola v. Choudry*, 533 F.3d 601, 606 (7th Cir. 2008) (citations omitted).

---

[2]The Court notes that the focus of the parties' citations is on "premature deliberation or . . . pre-deliberation statements indicating [a juror] had already made up their mind[]." *United States v. Farmer*, 717 F.3d 559, 565 (7th Cir. 2013). Those are not the operative questions here. Instead, the only issue is whether Juror Number One's research, brought to the table in deliberations, was extraneous and prejudicial.

The Court finds that Juror Number One's research was not "extraneous." It occurred before this matter was called for trial, at a time when Juror Number One was under no constraints from the Court as to whether the research was appropriate. The juror was further entitled to bring her experience, including the research, to the jury's deliberations. The juror is "a researcher by nature" and that philosophy cannot be excluded from deliberations merely because the research in question concerned legal issues. (Docket #88 at 7).

Moreover, the information she obtained went beyond the pale of what is "extraneous." The Court views "extraneous" material as that which bears directly on the parties and specific events involved in a trial, but which was not properly presented to the jury in the courtroom as admissible evidence. Juror Number One's research falls well short of that; it was entirely unrelated information having nothing to do with Defendants, the events underlying this case, or even police misconduct generally.

This conclusion is supported by reference to the Court's instructions to the jury during trial. The Court instructed the jury to determine the facts based on the evidence presented at trial. (Docket #87 at 29, 31). As to research specifically, the Court instructed that

> I do not want any of you to conduct any independent research or make any investigation of either the facts associated with this case or the individual witnesses or the parties or their lawyers.
> You are ultimately called upon to decide the facts from the evidence to be presented and in accordance with the Court's instructions on the law and from no other source. This means that until the jury is discharged, you may not conduct any independent research. In other words, you may not consult with any form of reference material including blogs, dictionaries, internet websites or searches to obtain information

**either about the facts of this case or anyone who has anything to do with it.**

*Id.* at 35-36 (emphasis added). In its final instructions, the Court informed the jurors that they may "consider and view the evidence in light of your own observations and experiences in the affairs of life" and may draw inferences from the evidence based on their life experience. (Docket #85 at 121, 127).[3]

In each of its pre-recess reminder instructions to the jurors, the Court asked them not to discuss the case amongst themselves or with anyone else. For example, for the recess prior to closing arguments, the Court stated that the jurors "can talk about anything, including who has the best recipe for turkey on Thursday, or who might be the next coach of the Green Bay Packers, or some other interesting topic; but please do not discuss this case -- or anyone who has anything to do with it." (Docket #85 at 119). As the Court found above, Juror Number One did not do any research on Defendants or anything to do with police misconduct. Her research on unrelated cases, forms only a part of her "observations and experiences in the affairs of life[.]" *See id.* at 121. As with any pre-trial research, she was free to bring that into the jury's deliberations. Her actions comported with the Court's instructions and they form no basis to impugn the verdict.

Defendants' primary argument is that Juror Number One not only lied about sharing her research with the jury, and when she did the research, but also the subject of the research. Namely, they contend that:

> A simple Google search using the name "Michael Vagnini" or the term "strip search" results in the production of a plethora of information regarding other cases involving allegations of unlawful searching by Milwaukee police officers,

---

[3]Defendants offered no objections to any of the cited instructions.

related criminal prosecutions and civil cases and civil case settlements, [a]long with the criminal prosecution of four former officers, including Officer Vagnini, and their resignations from the MPD. It is likely that if Juror No. 1, who admittedly is "a researcher by nature," turned on her computer and entered these or other related phrases, she uncovered the above-described information and more. Thus, Juror No. 1 likely considered highly inflammatory information that was not presented during the trial, much less admitted into evidence. If she uncovered that information, and then shared it with the jury (as was likely, given the testimony of the foreperson), she infected the entire jury pool with bias, and thus tainted the validity of the verdict on all counts.

(Docket #93 at 9-10). The Court cannot follow Defendants along this chain of inferences. Both Juror Number One and the foreperson testified that no information regarding other police misconduct cases came into the jury's deliberations, much less information about Defendants themselves. Defendants' proffered inferences are mere speculation which are wholly insufficient to support a claim of juror misconduct. *See United States v. Morales*, 655 F.3d 608, 630 (7th Cir. 2011); *United States v. Moore*, 641 F.3d 812, 829 (7th Cir. 2011).[4]

Because the Court finds that Juror Number One's research was not "extraneous," it need not reach the question of prejudice to deny Defendants' motion as to this point. On a final note, Defendants contend that if the jury's verdict is vacated per their request, the Court can simply enter judgment in their favor "given the preponderance of evidence in their favor, as developed

---

[4]Defendants hint at a secondary argument related to Juror Number One's *voir dire* responses. (Docket #99 at 5). They imply that she failed to disclose her research in those responses. However, Juror Number One was never asked any question where such a disclosure would be merited. *See* (Docket #87 at 2-28). Defendants did not object to the Court's *voir dire* examination and cannot allege fault in it now.

during the trial." (Docket #93). Not only do they fail to cite *any* relevant law in support of the argument, *see id.* at 10-14, the Court will not vacate the verdict, as discussed above. The argument is, therefore, moot.[5]

### 3.2    Damages

Defendants' second argument is leveled at the jury's damages awards, not the verdict itself. Defendants contest both the compensatory and punitive damage awards. Newman's compensatory damage award was as follows: $150,000 as to Vagnini for his unreasonable search, and $60,000 as to each of Cline and Martinez for their failure to intervene to stop the search, for a total of $270,000. (Docket #62 at 1-4). The jury also awarded a total of $1,725,000 in punitive damages, assessed to Defendants as follows: $1,125,000 against Vagnini, $200,000 against Cline, and $400,000 against Martinez. *Id.* at 4-6.

---

[5]It is not clear whether Defendants desire their "great weight of the evidence" argument to stand regardless of whether juror misconduct succeeds in knocking out Newman's verdict. Assuming they did, it would fail for two reasons. First, Defendants did not preserve the argument by submitting the appropriate intra- and post-trial motions. *See* Fed. R. Civ. P. 50(a)-(b); *see Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 823 (7th Cir. 2016). Second, the standard of review renders the argument toothless. *See supra* Part 2; *Moore ex rel. Estate of Grady v. Tuelja*, 526 F.3d 423, 427 (7th Cir. 2008) ("A verdict will be set aside . . . only if no rational jury could have rendered the verdict. Jury verdicts deserve particular deference in cases with simple issues but highly disputed facts.") (citations and quotations omitted). The evidence at trial was, as stressed repeatedly by the parties, a pure credibility determination. *See, e.g.*, (Docket #84 at 30) (from Defendants' opening statement: "[W]e agree that this is a case that really is a who do you believe, and that's why we're here for you. If you believe Mr. Newman's version of the story, there was an unlawful search; the manner of the search was inappropriate. If you believe what the officers will tell you, the search was perfectly lawful and appropriate and reasonable given the circumstances."). This was the epitome of a simple case with highly disputed facts. *Moore*, 526 F.3d at 427. The jury found Newman more credible than Defendants and the Court cannot substitute in its own feelings on the matter. The jury clearly had a rational basis on which to find for Newman.

Court takes up the compensatory damages first, as they inform the Court's analysis of appropriate punitive damages.

### 3.2.1 Compensatory Damages

When a party challenges a compensatory damages award as being excessive, the Court examines three factors: (1) whether the award is monstrously excessive; (2) whether there is no rational connection between the award and the evidence; and (3) whether the award is roughly comparable to awards made in similar cases. *Deloughery v. City of Chicago*, 422 F.3d 611, 619 (7th Cir. 2005). Awards that are "monstrously excessive" and which lack a rational connection to the evidence are generally one-and-the-same—they are irrational. *Adams v. City of Chicago*, 798 F.3d 539, 543 (7th Cir. 2015). Irrational awards are those which are the "product of passion and prejudice," or "the jury's fevered imaginings or personal vendettas." *Id.*; *G.G. v. Grindle*, 665 F.3d 795, 798 (7th Cir. 2011). In determinating the rationality of an award, "the district court must review the trial record as a whole in the light most favorable to the verdict. This perspective is essential, if we are to preserve the jury's role as the trier of fact." *Adams*, 798 F.3d at 543.

Newman's evidence of his damages was brief. Indeed, the entirety of his testimony on the point was presented in just a couple of minutes:

> Q [by Newman's attorney Mr. Bornstein]: How did [Vagnini's search] make you feel?
> A [Newman]: Man, it was humiliating. You know, it was -- Made me feel less than a man. Never been through anything like that, you know.
>     . . .
> Q: Now, I want to talk a little bit about the way this made you feel, what Officer -- then Officer Vagnini did to you. When Mr. Vagnini pulled your pants down in public and touched your bare genitals with his bare hand, how did that make you feel?

Case 2:15-cv-01363-JPS    Filed 04/03/17    Page 14 of 27    Document 102

> A: First of all, it was humiliating to me as a man, another man
> just doing this to me. I feel horrible now. I never felt like that
> day in my life. I never been through anything like that, and it
> was embarrassing. It was just -- It was terrible now, and then
> -- I mean, it was out in public.
> Q: Well, do you still think about it?
> A: Yeah, I think about it.
> Q: Even though six years have passed?
> A: It was like, you know, when you violated and you know you
> violated, and there's nothing being done -- nothing had been
> done; so, yeah, it's still messing with me sometimes.
> Q: Is it any less painful for you today than it was six years
> ago?
> A: No.

(Docket #84 at 53, 64-65). Shenena Townes, Newman's former spouse, said that soon after the search, Newman told her "he was clearly upset" about having been searched. *Id.* at 114. As to the search itself, even viewing the evidence most favorably to the verdict, it lasted only a few moments in the early morning darkness with no non-party witnesses present (at least none who testified at trial). Newman presented no other evidence on damages, such as mental health treatment or employment or family problems.

Newman's position is unlike that of the plaintiff in his primary citation, *Joan W*. There, Joan W. was arrested and strip searched pursuant to Chicago's unconstitutional blanket strip search policy. *Joan W. v. City of Chicago*, 771 F.2d 1020, 1021 (7th Cir. 1985). Joan W. was forced to expose her vaginal and anal areas while the searching officers laughed and cussed at her. *Id.* As to her damages, Joan W. testified that

> the incident caused her emotional distress that manifested itself
> in reduced socializing, poor work performance, paranoia,
> suicidal feelings, depression, and an inability to disrobe in any
> place other than a closet. She introduced evidence tending to
> show that she was peculiarly sensitive to the kind of physical

violation she had endured because she was a private person who even during high school gym classes could not completely disrobe in front of others and was conscious of her physical disabilities caused by her chronic arthritis.

*Id.* at 1021-22. The court nevertheless decided that the jury's award of $112,000 was excessive and reduced it to $75,000. *Id.* at 1025.

In so doing, the *Joan W.* court relied on its previous opinions regarding similar searches, *Mary Beth G. v. City of Chicago*, 723 F.2d 1263 (7th Cir. 1983), and *Levka v. City of Chicago*, 748 F.2d 421 (7th Cir. 1984). In *Mary Beth G.*, the plaintiffs' distress "was adequately corroborated by persons who knew the women best. The testimony revealed, *inter alia*, instances of shock, panic, depression, shame, rage, humiliation, and nightmares, with lasting effects on each woman's life." *Mary Beth G.*, 723 F.2d at 1275. Further, "each woman still thinks about the strip search, and each woman's attitudes and relationships with others have been colored by the experience." *Id.*

In *Levka*, the court found that the plaintiff's damages were excessive. In additional to suffering humiliation and horror during a search similar to those experienced in the other cases, Levka testified that she became frightened to go out alone at night, including to movies or parties, and sought some limited psychiatric treatment. *Levka*, 748 F.2d at 423. Other witnesses corroborated Levka's statements and further testified to the negative impact Levka's distress had on her daily life and employment. *Id.* at 423-24. The defendant countered with witnesses showing that Levka regularly left her home, went out at night, and that the distress had no relation to her work problems. *Id.* at 424. The court held that the defendant adequately undermined Levka's position that "she has become a prisoner in her own home," and that her single psychiatrist visit was inconsistent with her claim

Case 2:15-cv-01363-JPS    Filed 04/03/17    Page 16 of 27    Document 102

of severe trauma. *Id.* at 427. It concluded that Levka's evidence was insufficient to support the jury's $50,000 damage award, especially when compared to similar cases (discussed further *infra*), and remitted the award to $25,000. *Id.* at 425-27.

The Court finds that the jury's award in this case was irrational against the backdrop of the evidence presented. The Court does not discount Newman's humiliation, but the search was exceptionally brief and, notwithstanding the fact that the participants were technically "in public," was not seen by anyone other than the parties at trial. Newman offered no evidence of lasting trauma other than that he thinks about the search today and it still "mess[es] with [him] sometimes." (Docket #84 at 65). He did not testify to any psychiatric or other medical treatment he sought or received following the search, nor did he attribute any lasting employment or social problems to the search. Newman's search was different than those in *Joan W.* and *Mary Beth G.*, where the plaintiffs offered evidence of distress which impacted their personal, social, and professional lives. Indeed, Newman's evidence is even less than that in *Levka*, where she at least attempted to establish lasting harms, though the court found that their severity was diminished by countervailing testimony.

Having concluded that Newman's compensatory damage awards are irrational, the Court must determine a more appropriate value. This task is quite difficult because Defendants have failed to cite any comparators, and Newman offers only one, *Joan W.*, an opinion which was issued more than thirty years ago. This may be because so few cases of this type result in appellate decisions. In the recent past, the majority of the Seventh Circuit's opinions on purportedly excessive compensatory damage awards involve employment discrimination or retaliation. *See E.E.O.C. v. Autozone, Inc.*, 707

F.3d 824, 834 (7th Cir. 2013). Left with little alternative, the Court considers this relevant yet aged precedent in arriving at an appropriate award.

As noted above, *Joan W.* and its related cases involved very similar facts, and all were based on the City of Chicago's unconstitutional strip search policy. Though Newman also alleged that Vagnini's search was done pursuant to an unofficial City of Milwaukee policy, that claim was dismissed on summary judgment for lack of evidence. *See* (Docket #35). It is also unclear as to whether any of the 1980s Chicago strip search plaintiffs presented policy evidence in support of their damages claims. Thus, the Court finds that these damage awards may be used as rough comparators. Even so, the Court is reminded that "[a]wards in other cases provide a reference point that assists the court in assessing reasonableness; they do not establish a range beyond which awards are necessarily excessive." *Lampley v. Onyx Acceptance Corp.*, 340 F.3d 478, 485 (7th Cir. 2003). The *Lampley* court further noted that "[d]ue to the highly fact-specific nature of Title VII cases, such comparisons are rarely dispositive." *Id.* The Court's determination is similarly fact-specific and is therefore not tightly bound to the 1980s strip search cases.

The *Hardy* case is also instructive on the appropriate compensatory award. *Hardy v. City of Milwaukee*, 88 F.Supp.3d 852 (E.D. Wis. 2015). There, in a case involving an unlawful stop, frisk, and false arrest by a City of Milwaukee police officer, the jury awarded compensatory damages of $6,000. *Id.* at 882. While this award was not subject to appellate review, the Court nevertheless believes it provides a good barometer for the award in this case, given its recency and the similarity of the claims.

As noted above, Newman's compensatory damage award totaled $270,000. (Docket #62 at 1-4). As summarized in *Bailey*,

> At the time *Joan W.* was decided, at least ten suits had been tried before juries in the Northern District of Illinois. Damage awards ranged from a low of $3,300 to a high of $60,000. The jury's award of $112,000 to Joan was clearly disproportionate to the earlier awards. We went on to examine the factual circumstances of each of the cases and found that some of the searches were more aggravated than the search to which Joan had been subjected. . . . Based on this comparison, we believed that the damage award was excessive to the extent it exceeded $75,000.

*Bailey v. Andrews*, 811 F.2d 366, 374 (7th Cir. 1987). Adjusted for inflation, the amounts compiled by *Joan W.* range from approximately $8,000 to $180,000. *See* (Docket #95 at 23 and #96).[6] Newman's award greatly exceeds even the top of this range, as well as the *Hardy* award.

The Court believes that, in light of the above-cited case law and the mitigating circumstances of his strip search, an award of $7,500 is supported by the evidence.[7] Adjusted proportionally, the award for Vagnini becomes

---

[6] Newman offered inflation-adjusted figures in a table in his brief. Defendants did not object to them in their reply. The Court nevertheless takes issue with his calculations to the extent they were all based on 1978 dollars. (Docket #96). The jury verdicts in those cases were entered from 1982 to 1984. *Levka*, 748 F.2d at 425. The figures stated in-text are adjusted for 1983 dollars, using the same inflation calculator Newman utilized. *See* U.S. Dept. of Labor Bureau of Labor Statistics, C P I   I n f l a t i o n   C a l c u l a t o r, *a v a i l a b l e   a t*: https://www.bls.gov/data/inflation_calculator.htm.

[7] Newman cites two aging Seventh Circuit opinions in support of the Court's application of the "maximum recovery rule." (Docket #95 at 22). That rule "directs that the court set [a remitted damages] amount based on the highest amount of damages that the jury could properly have awarded based on the relevant evidence." *Jabat, Inc. v. Smith*, 201 F.3d 852, 858 (7th Cir. 2000) (quotation omitted). Those are the *only* two opinions which discuss that rule, suggesting that it is little used. *See id.*; *Spesco, Inc. v. Gen. Elec. Co.*, 719 F.2d 233, 240-41 (7th Cir. 1983). In any event, that is what the Court has done here; it has remitted the compensatory damages to the level supported by the evidence.

$5,000, and the awards for Cline and Martinez become $1,250 each. The Court will discuss the procedural implementation of this remittitur below.

### 3.2.2 Punitive Damages

Defendants initially argue that punitive damages are not warranted in any measure because their conduct was not malicious. A jury may award punitive damages in a Section 1983 case if it finds "that [Defendants were] 'motivated by evil motive or intent' or acted with 'reckless or callous indifference' to [Newman's] constitutional rights." *Wright v. Miller*, 561 F. App'x 551, 555 (7th Cir. 2014) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)). The Seventh Circuit, in the context of a Section 1981a claim, held that "[a] plaintiff may satisfy [the malice] element by demonstrating that the relevant individuals knew of or were familiar with the anti-discrimination laws but nonetheless ignored them or lied about their discriminatory activities." *AutoZone, Inc.*, 707 F.3d at 835 (quotation omitted). Extending that standard to this case, the Court finds that Defendants' malice may be shown with evidence that they knew of the constitutional rules applicable to searching a person but ignored them and lied about doing so.

Applying FRCP 59(a)'s deference to the jury's verdict, it is clear that the jury properly awarded punitive damages. Defendants testified that they were trained on and knew how searches should be appropriately conducted. *See* (Docket #84 at 172-73, 184, 199-201, 216; Docket #85 at 67-81, 100, 108, 111, 115). They also testified to their own version of the events of April 30, 2010, which was directly contradictory to Newman's. *Id.* In finding for Newman on his compensatory damage claims, the jury concluded that Defendants had lied on the witness stand regarding their version of the events. *See* (Docket #62 at 1-4). In awarding punitive damages, the jury was entitled to consider that Defendants knew what they did violated Newman's constitutional

rights. The jury had ample evidence upon which to find the requisite motive to support a punitive damages award.

Defendants next challenge the amount of punitive damages as excessive. Recall that the total punitive damages award was $1,725,000. (Docket #62 at 4-6). Punitive damages "serve the same purposes as criminal penalties[,]" and thus such damages must comport with due process. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 417 (2003). When punitive damage awards are "grossly excessive," due process may be offended. *Farfaras v. Cit. Bank & Trust of Chicago*, 433 F.3d 558, 567 (7th Cir. 2006). The Supreme Court has announced three guideposts to help courts evaluate this concern. These are: "[1] the degree of reprehensibility of the defendant's conduct; [2] the disparity between the harm suffered by the plaintiff and the punitive damages award; and [3] the difference between the award in this case and the penalties imposed in comparable cases." *Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010, 1023 (7th Cir. 2016) (citing *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 574-75 (1996)).

The first guidepost is "[p]erhaps the most important indicium of the reasonableness of a punitive damages award." *Autozone*, 707 F.3d at 838. The Supreme Court has offered specific guidance on assessing reprehensibility:

> We have instructed courts to determine the reprehensibility of a defendant by considering whether: [1] the harm caused was physical as opposed to economic; [2] the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; [3] the target of the conduct had financial vulnerability; [4] the conduct involved repeated actions or was an isolated incident; and [5] the harm was the result of intentional malice, trickery, or deceit, or mere accident. The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any

> award suspect. It should be presumed a plaintiff has been
> made whole for his injuries by compensatory damages, so
> punitive damages should only be awarded if the defendant's
> culpability, after having paid compensatory damages, is so
> reprehensible as to warrant the imposition of further sanctions
> to achieve punishment or deterrence.

*State Farm*, 538 U.S. at 419 (citations omitted).

As to the first factor, Newman's harm did not involve physical injury to him or the infliction of pain. Rather, it caused him psychological harm. Still, the factor weighs in Newman's favor, as the injury was not merely economic. As to the second, Defendants' conduct did not show an indifference to anyone's health or safety. The strip search here lasted only a few moments and was motivated, as the evidence showed, by Defendants' belief that Newman was armed or had illegal contraband. The third factor is largely irrelevant to this case, and no evidence was received on Newman's wealth. As to the fourth factor, the Court excluded evidence of any other similar acts by Defendants. *See* (Docket #41 and #55). The final factor does not clearly favor either side; though the jury found Defendants' conduct "malicious or in reckless disregard" of Newman's rights, that is not the same as intentional malice towards Newman himself. *See, e.g.*, (Docket #62 at 4). In sum, though Defendants' actions were certainly reprehensible, the weakness of some of these factors reveals that the current level of punitive damages exceeds that which is necessary to punish them.

The second guidepost requires comparison of the compensatory and punitive awards made by the jury, which shows the "ratio between punitive damages and the actual harm inflicted on the plaintiff." *Auto-Zone*, 707 F.3d at 839 (quotation omitted). The Seventh Circuit has noted that "[t]he Supreme Court has repeatedly declined to set a fixed ratio to limit punitive damages

based on constitutional grounds, but it has recognized that in practice, 'few awards exceeding a single-digit ratio between punitive and compensatory damages . . . will satisfy due process.'" *Id.* at 839 (quoting *State Farm*, 538 U.S. at 424-25).

In light of the Court's reduction of the compensatory damage awards, the ratio between the punitive and compensatory damages is now 230:1. While it is true that "[t]he smaller the compensatory damages, the higher the ratio of punitive to compensatory damages has to be in order to fulfill the objectives of awarding punitive damages," those objectives are left far behind by this exorbitant disparity. *Cooper v. Casey*, 97 F.3d 914, 919 (7th Cir. 1996). The punitive damages award must be reduced substantially in order to comport with due process-approved ratios.[8]

---

[8]Defendants also attempt to revive an argument this Court rejected in *Hardy*. There, "[t]he City[] [argued] that the Court should reduce the punitive damages award using a 1:1 ratio, creating federal common law that imposes such a limit on all civil rights cases." *Hardy*, 88 F.Supp.3d at 879. Defendants, also represented by the City Attorney's Office which litigated *Hardy*, advance the very same position here. (Docket #93 at 17-18). *Hardy* rejected the argument:

> First, the primary case cited by the City, *Exxon Shipping Co. v. Baker*, 554 U.S. 471 . . . (2008), is a maritime case. Second, the Court cannot find any cases from the Seventh Circuit or any other circuit that adopt such a limit. In fact, the Court cannot find any case law that even questions whether punitive damages in civil rights cases are available at ratios higher than 1:1. Finally, the Seventh Circuit considered whether to extend *Exxon Shipping's* 1:1 ratio to civil rights cases and implied it would not, though it did not ultimately need to reach the question. *Kunz v. DeFelice*, 538 F.3d 667, 678-79 (7th Cir. 2008).

*Id.* at 879-80. Defendants have again cited *Exxon Shipping* and again fail to point to any Seventh Circuit case adopting its rule. (Docket #93 at 18). The Court must continue to reject this argument.

The third guidepost may be the most telling in this case, but also the most troublesome. It is troublesome for lack of truly comparable cases. As observed in *Hardy*, "[t]he fact-specific nature of claims, particularly in the civil rights context, results in a dearth of apples-to-apples comparisons." *Hardy*, 88 F.Supp.3d at 883. The parties have each cited a number of potential comparators, none of which genuinely approximates the specific facts of this case, and which vary widely in what they believe is an acceptable award. *See, e.g.*, *McKinley v. Trattles*, 732 F.2d 1320 (7th Cir. 1984) (prisoner believed to have contraband was strip searched, including a search of his anal cavity; appellate court suggested that the trial court should remit the punitive damages of $15,000 to no more than $6,000); *Romanski v. Detroit Ent., L.L.C.*, 428 F.3d 629 (6th Cir. 2005) (false arrest of an elderly woman in a casino over alleged theft of a five-cent token; appellate court remitted punitive damage award from $875,000 to $600,000). *Hardy* did its best to marshal relevant Seventh Circuit-approved punitive damage awards, which ranged from 2:1 to 10:1 ratios between punitive and compensatory damages. *Hardy*, 88 F.Supp.3d at 883. Finally, *Hardy* itself, which as noted above involved similar police misconduct, reduced a $500,000 award to $54,000. *Id.* at 884. These cases starkly demonstrate that the current ratio of punitive to compensatory damages cannot stand.

In light of Defendants' due process rights and the Supreme Court's guidance thereon, the Court must reduce the jury's punitive damages award. It concludes that a constitutionally permissible total award is $45,000. As divided proportionally among Defendants, the figures are $30,000 as to Vagnini, $5,000 as to Cline, and $10,000 as to Martinez.

4. **CONCLUSION**

In light of the foregoing, the Court will uphold the jury's verdict but reduce the damages awards as follows:

Compensatory damages as against:

| | |
|---|---|
| Vagnini: | $5,000 |
| Cline: | $1,250 |
| Martinez: | $1,250 |

Punitive damages as against:

| | |
|---|---|
| Vagnini: | $30,000 |
| Cline: | $5,000 |
| Martinez: | $10,000 |
| **Total damages:** | **$52,500** |

This is a substantial reduction from the amounts awarded by the jury, but the Court believes that viewing all of the evidence in light of applicable precedent, this is the most that could have been appropriately awarded to Newman.

Newman thus has a choice to make. If he consents to the remittitur of his damage awards, judgment will be entered accordingly. *Adams*, 798 F.3d at 542; *Fox v. Hayes*, 600 F.3d 819, 846 (7th Cir. 2010). If he rejects the remittitur, the Court will vacate the awards entirely and conduct a new trial on damages. *Id.* The Court will afford Newman until **April 17, 2017** to make his election. He should do so by way of a pleading filed with the Court.

The Court notes that Newman has a pending motion for attorney's fees. (Docket #64). As the prevailing party in this matter, and in light of the extensive motion and trial practice necessary to litigate it, he is likely entitled to a substantial award of fees. 42 U.S.C. § 1988; Fed. R. Civ. P. 54(d)(1). If the remittitur is accepted, the Court will refer the matter of Newman's fee award

to a randomly-assigned magistrate judge for mediation. If he chooses to have a new trial on damages, the mediation referral will occur at the conclusion of that proceeding. In either event, the arguments in Newman's fee motion will require adjustment to conform with any new damage award(s) and the fees he has incurred since it was filed. The Court will, therefore, deny the pending motion for attorney's fees without prejudice.

Finally, the Court addresses Newman's motion to revise the Court's October 18, 2016 summary judgment order. (Docket #97). There, the Court dismissed the City of Milwaukee (the "City") from this action with prejudice for Newman's failure to present a triable *Monell* claim against it. (Docket #35 at 16). Newman asserts that his indemnification claim, which is still active, is directed at the City, and so the City should not have been entirely dismissed from this action. (Docket #98). He asks that the Court revise the summary judgment order in accordance with FRCP 54(b) and 60(b). Defendants counter that state law requires the City to indemnify them regardless of whether it is formally included as a defendant in this action. (Docket #100); *see* Wis. Stat. § 895.46. While the Court appreciates Newman's concern, it is form over substance; the City will ultimately pay any judgment in this case. His motion will be denied.

Accordingly,

**IT IS ORDERED** that the evidentiary report of Magistrate Judge William E. Duffin on the issue of extraneous prejudicial information presented to the jury (Docket #81) be and the same is hereby **ADOPTED in part** and **REJECTED in part** in accordance with the terms of this Order;

**IT IS FURTHER ORDERED** that the defendants' motion to vacate and for a new trial (Docket #92) be and the same is hereby **GRANTED in part** and **DENIED in part** in accordance with the terms of this Order;

**IT IS FURTHER ORDERED** that the plaintiff shall make his election regarding the Court's remittitur in accordance with the terms of this Order no later than **April 17, 2017**;

**IT IS FURTHER ORDERED** that the plaintiff's motion for attorney's fees (Docket #64) be and the same is hereby **DENIED without prejudice**; and

**IT IS FURTHER ORDERED** that the plaintiff's motion to revise the Court's October 18, 2016 order (Docket #97) be and the same is hereby **DENIED**.

Dated at Milwaukee, Wisconsin, this 3rd day of April, 2017.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge